881 A.2d 733 (2005)
380 N.J. Super. 133
STATE of New Jersey, Plaintiff-Respondent,
v.
John O'HAGEN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 24, 2005.
Decided September 7, 2005.
*736 Yvonne Smith Segars, Public Defender, attorney for appellant (Alyssa Aiello, Assistant Deputy Public Defender, of counsel and on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Janet Flanagan, Deputy Attorney General, and Denise Hollingsworth, Deputy Attorney General, of counsel and on the brief).
Before Judges STERN, COBURN and GRAVES.
The opinion of the court was delivered by
GRAVES, J.A.D.
After entering a guilty plea to one count of third-degree possession of a controlled dangerous substance (heroin), defendant, John O'Hagen, was sentenced on October 3, 2003, to a three-year term of imprisonment with a nine-month period of parole ineligibility. The sentencing judge ordered defendant "to undergo DNA [deoxyribonucleic acid] testing to keep his genetic markers in the offender population base," and the judgment of conviction required defendant "to provide a DNA sample" and to "pay the costs for testing of the sample provided." At the close of the sentencing hearing, defendant objected to the DNA testing on the basis that his offense occurred prior to the effective date of N.J.S.A. 53:1-20.20(g), which mandates that every person convicted of a crime shall submit a blood or other biological sample for the purpose of DNA testing.[1]
On appeal, defendant challenges the constitutionality of the "DNA Database and Databank Act of 1994" (the DNA Act), N.J.S.A. 53:1-20.17 to -20.28. Defendant contends that the collection and testing of a blood or other biological sample compelled by the DNA Act violates his right to be free from unreasonable searches and seizures and his right to equal protection of the law under both the State and Federal Constitutions. Although reviewing courts normally do not consider issues that were not properly presented to the trial court, this is a matter "of sufficient public concern," and we will address defendant's contentions. See Alan J. Cornblatt, P.A. v. Barow, 153 N.J. *737 218, 230, 708 A.2d 401 (1998) (quoting State v. Churchdale Leasing, Inc., 115 N.J. 83, 100, 557 A.2d 277 (1989)). Because we conclude that the DNA Act is not unconstitutional, we affirm the portion of defendant's judgment of conviction that required him to submit a DNA sample.
The DNA Act established a State databank and database containing DNA samples and DNA profiles of certain convicted offenders "for use in connection with subsequent criminal investigations." Assembly Judiciary, Law and Pub. Safety Comm., Statement to Assembly Bill No. 1952 (June 23, 1994), reprinted in N.J.S.A. 53:1-20.17. Under the DNA Act, the Division of State Police is responsible for analyzing and classifying DNA samples, N.J.S.A. 53:1-20.24(a), which are then stored and maintained in the State DNA databank, as well as records of identification characteristics resulting from DNA testing, which are stored and maintained in the State DNA database, N.J.S.A. 53:1-20.21. These records are also forwarded to the Federal Bureau of Investigation (FBI) for inclusion in the Combined DNA Identification System (CODIS), N.J.S.A. 53:1-20.21, -20.24(a), "the FBI's national DNA identification index system that allows the storage and exchange of DNA records submitted by State and local forensic laboratories," N.J.S.A. 53:1-20.19. The stated purpose of this legislation is to deter and detect recidivist acts and "to assist federal, state and local criminal justice and law enforcement agencies in the identification and detection of individuals who are subject to criminal investigations." N.J.S.A. 53:1-20.18.
As enacted in 1994, the DNA Act originally required only adults convicted of certain serious sexual offenses to submit a blood sample for the purpose of DNA testing. N.J.S.A. 53:1-20.20(a). In 1997, the DNA Act was expanded to require juveniles adjudicated delinquent for certain acts, which if committed by an adult, would constitute serious sexual offenses, as well as adults found guilty by reason of insanity of a serious sexual offense, to provide a blood sample. N.J.S.A. 53:1-20.20(b), (c). The scope of the DNA Act was again expanded in 2000 to require DNA testing of every person convicted of (and those found not guilty by reason of insanity for) murder, manslaughter, second-degree aggravated assault, luring or enticing a child, engaging in sexual conduct which would impair or debauch the morals of a child, or any attempt to commit any of these crimes, with a similar provision applying to juveniles. N.J.S.A. 53:1-20.20(d)-(f). The 2000 amendment also authorized those required to undergo DNA testing to either have a blood sample drawn or "other biological sample" collected. N.J.S.A. 53:1-20.20.
Effective September 22, 2003, the following provision, challenged on this appeal, was made a part of the DNA Act:
Every person convicted or found not guilty by reason of insanity of a crime shall have a blood sample drawn or other biological sample collected for purposes of DNA testing. If the person is sentenced to a term of imprisonment or confinement, the person shall have a blood sample drawn or other biological sample collected for purposes of DNA testing upon commencement of the period of imprisonment or confinement. If the person is not sentenced to a term of imprisonment or confinement, the person shall provide a DNA sample as a condition of the sentence imposed. A person who has been convicted or found not guilty by reason of insanity of a crime prior to the effective date of [L. 2003, c. 183] and who, on the effective date, is serving a sentence of imprisonment, probation, parole or other form of *738 supervision as a result of the crime or is confined following acquittal by reason of insanity shall provide a DNA sample before termination of imprisonment, probation, parole, supervision or confinement, as the case may be.
[N.J.S.A. 53:1-20.20(g).]
Because defendant was convicted of a crime and his sentence of imprisonment for that crime commenced after the effective date of this latest amendment he was required to submit a DNA sample. See State v. Vasquez, 374 N.J.Super. 252, 270, 864 A.2d 409 (App.Div.2005) (affirming requirement that the defendant, who was convicted of heroin possession and related crimes, submit a DNA sample because such submission "is required of all individuals convicted of a crime"). Defendant contends, however, that the DNA Act is unconstitutional and, therefore, his DNA sample "should be eliminated from the DNA Databank."
Both the Fourth Amendment of the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution protect people against unreasonable searches and seizures. There is no question that the state-compelled collection and subsequent analysis of a blood or other biological sample constitutes a search. See, e.g., Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639, 660 (1989); Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908, 918 (1966); State v. Ravotto, 169 N.J. 227, 236, 777 A.2d 301 (2001); In re J.G., 151 N.J. 565, 576, 701 A.2d 1260 (1997); N.J. Transit PBA Local 304 v. N.J. Transit Corp., 151 N.J. 531, 543, 701 A.2d 1243 (1997). Nevertheless, not all searches violate constitutional protections, only those that are unreasonable. Skinner, supra, 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661. Thus, we must decide if the taking of blood or other biological sample for the purpose of DNA testing pursuant to the DNA Act is reasonable.
Determining whether a search is reasonable "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner, supra, 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661 (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381, 388 (1985)). In other words, "the reasonableness of a search is determined `by assessing, on the one hand, the degree to which it intrudes on an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" United States v. Knights, 534 U.S. 112, 118-19, 122 S.Ct. 587, 591, 151 L.Ed.2d 497, 505 (2001) (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408, 414 (1999)).
"When a search is conducted in furtherance of a criminal investigation, the balance is most often tipped `in favor of the procedures described by the Warrant Clause of the Fourth Amendment.'" In re J.G., supra, 151 N.J. at 576-77, 701 A.2d 1260 (quoting Skinner, supra, 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661). "Except in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." Skinner, supra, 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661 (citations omitted); accord State v. Hempele, 120 N.J. 182, 217, 576 A.2d 793 (1990) ("The New Jersey Constitution requires the approval of an impartial judicial officer based on probable cause before most searches may be undertaken." (internal quotation marks and citations omitted)).
*739 Generally, an exception to the warrant requirement must be based on a showing of "probable cause to believe that the person to be searched has violated the law." Skinner, supra, 489 U.S. at 624, 109 S.Ct. at 1417, 103 L.Ed.2d at 664 (citation omitted). "When the balance of interests precludes insistence on a showing of probable cause, [courts] have usually required `some quantum of individualized suspicion' before concluding that a search is reasonable." Ibid. (citation omitted). The United States Supreme Court has "made it clear, however, that a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable." Ibid. (citation omitted). A suspicionless search may nevertheless be upheld if the government demonstrates "special needs, beyond the normal need for law enforcement," that "make the warrant and probable-cause requirement impracticable." Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709, 717 (1987) (quoting New Jersey v. T.L.O., 469 U.S. 325, 351, 105 S.Ct. 733, 748, 83 L.Ed.2d 720, 741 (1985) (Blackmun, J., concurring)).
"All fifty states have enacted statutes creating a DNA database, as has the federal government." Robin Cheryl Miller, Annotation, Validity, Constr., & Operation of State DNA Database Statutes, 76 A.L.R. 5th 239 § 2(b) (2005) (footnotes omitted). "Those courts faced with the question whether a DNA database statute authorizes an unreasonable search and seizure in violation of the Fourth Amendment (and occasionally analogous state constitutional provisions) have uniformly expressed the view that it does not." Id. at § 2(a). The approaches utilized by the courts in upholding the validity of these statutes, however, have not been uniform.
Some courts have applied the "special needs" doctrine and found that the purposes served by the DNA database statutes go beyond ordinary law enforcement needs. See, e.g., Green v. Berge, 354 F.3d 675, 679 (7th Cir.2004) (upholding Wisconsin's DNA collection statute); United States v. Kimler, 335 F.3d 1132, 1146-47 (10th Cir.) (upholding the federal DNA statute), cert. denied, 540 U.S. 1083, 124 S.Ct. 945, 157 L.Ed.2d 759 (2003); Roe v. Marcotte, 193 F.3d 72, 79 (2d Cir.1999) (upholding Connecticut's DNA statute). Other courts have adhered to a traditional totality of the circumstances test, balancing the interests of the inmate or probationer challenging the statute and the interests of the government before finding that compulsory DNA collection and testing constitutes a reasonable search. See, e.g., United States v. Sczubelek, 402 F.3d 175, 184 (3d Cir.2005) (upholding the federal DNA statute); Padgett v. Donald, 401 F.3d 1273, 1278 (11th Cir.2005) (upholding Georgia's DNA statute), petition for cert. filed, 73 U.S.L.W. 3719, ___ U.S. ___, 126 S.Ct. 352, ___ L.Ed.2d ___ (2005); United States v. Kincade, 379 F.3d 813, 839 (9th Cir.2004) (upholding the federal statute), cert. denied, ___ U.S. ___, 125 S.Ct. 1638, 161 L.Ed.2d 483 (2005); Groceman v. U.S. Dep't of Justice, 354 F.3d 411, 413-14 (5th Cir.2004) (upholding the federal DNA statute); Boling v. Romer, 101 F.3d 1336, 1340 (1996) (upholding Colorado's DNA statute); Jones v. Murray, 962 F.2d 302, 307 (4th Cir.) (upholding Virginia's DNA database statute), cert. denied, 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992).
Although there is no reported case analyzing the reasonableness of New Jersey's DNA Act, we note that our courts have previously applied a "special needs" analysis in determining the validity of compulsory blood and urine testing in different contexts. See, e.g., Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J. 568, 619, 826 A.2d 624 (2003) (applying a special needs analysis to sustain *740 random suspicionless drug and alcohol testing of students involved in extracurricular activities); In re J.G., supra, 151 N.J. at 578-79, 590, 701 A.2d 1260 (applying a special needs analysis to determine the constitutionality of state statutes requiring HIV testing of accused or convicted sex offenders); N.J. Transit PBA Local 304 v. N.J. Transit Corp., supra, 151 N.J. at 556, 701 A.2d 1243 (specifically adopting the special needs approach to analyze the reasonableness of the transit authority's random drug and alcohol testing of transit police officers); Hamilton v. N.J. Dep't of Corr., 366 N.J.Super. 284, 287, 841 A.2d 94 (App.Div.2004) (using the special needs test to determine whether the department could compel urine testing of an inmate without offending either the state or federal constitutions).
We also note, however, that the Third Circuit recently rejected the application of the special needs doctrine when analyzing the reasonableness of the DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C.A. §§ 14135-14135e, which, like New Jersey's DNA Act, "mandates the collection of DNA samples from prisoners, parolees, and individuals on probation and supervised release who have committed certain qualifying offenses," United States v. Sczubelek, supra, 402 F.3d at 176. The court started with a special needs analysis, id. at 183, but ultimately decided to utilize the totality of the circumstances test in analyzing the constitutionality of the federal DNA statute:
Because we conclude that the purpose for the collection of DNA goes well beyond the supervision by the Probation Office of an individual on supervised release, as was the situation in Griffin, we believe that it is appropriate to examine the reasonableness of the taking of the sample under the more rigorous Knights totality of the circumstances test rather than the Griffin special needs exception.
[Sczubelek, supra, 402 F.3d at 184.]
In the present case, defendant asks us to apply the "special needs" doctrine, but argues that under this test, the DNA Act is unconstitutional because "there is no `special need' beyond normal law enforcement for the collection and testing of DNA." Alternatively, defendant contends that "even if a totality of the circumstances test is applied, the New Jersey statute still fails to pass constitutional muster" because "the government's interest in collecting DNA from persons convicted of simple possession of drugs does not outweigh the severe privacy intrusion occasioned by DNA collection and testing." The State submits that the DNA Act is valid under both tests.
We begin with a special needs analysis. The State's need for the DNA Act has been set forth in the statute as follows:
The Legislature finds and declares that DNA databanks are an important tool in criminal investigations and in deterring and detecting recidivist acts. It is the policy of this State to assist federal, state and local criminal justice and law enforcement agencies in the identification and detection of individuals who are the subjects of criminal investigations. It is therefore in the best interest of the State of New Jersey to establish a DNA database and a DNA databank containing blood or other biological samples submitted by every person convicted or found not guilty by reason of insanity of a crime.
[N.J.S.A. 53:1-20.18.]
Based on this language, defendant argues that the results of the DNA tests compelled by the DNA Act are used only for law enforcement purposes, and thus, the special needs test is not met. Nevertheless, *741 the DNA Act provides that the results of these tests shall be used for a wide variety of purposes:
a. For law enforcement identification purposes;
b. For development of a population database;
c. To support identification research and protocol development of forensic DNA analysis methods;
d. To assist in the recovery or identification of human remains from mass disasters or for other humanitarian purposes;
e. For research, administrative and quality control purposes;
f. For judicial proceedings, by order of the court, if otherwise admissible pursuant to applicable statutes or rules;
g. For criminal defense purposes, on behalf of a defendant, who shall have access to relevant samples and analyses performed in connection with the case in which the defendant is charged; and
h. For such other purposes as may be required under federal law as a condition for obtaining federal funding.
[N.J.S.A. 53:1-20.21.]
The State argues that "the searches authorized by the DNA Act are not for the purpose of uncovering the commission of a crime, but rather, for the purpose of obtaining identification information that can be used in the event independent evidence demonstrates that a crime has been committed." It asserts that "[l]ike fingerprint and photograph identification information, the DNA information does not, in and of itself, detect or implicate any criminal wrongdoing," quoting State v. Martinez, 276 Kan. 527, 78 P.3d 769, 774 (2003). See also Sczubelek, supra, 402 F.3d at 185 (finding that a DNA database "will aid in solving crimes when they occur in the future").
The State claims that it has a special interest in combating recidivism and that "the DNA collection requirement is an integral part of a comprehensive law enforcement effort to protect the public from convicted offenders by deterring them from committing additional offenses and, when deterrence fails, by holding them accountable for their crimes promptly via DNA identification." The State also claims that the public has a great interest in promptly identifying perpetrators and accurately prosecuting crimes. The Third Circuit recognized these interests as compelling and noted the following:
It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA databank, or left at the scene of a crime within samples of blood, skin, semen, or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

*742 [Sczubelek, supra, 402 F.3d at 185-86 (quoting Jones v. Murray, supra, 962 F.2d at 307).]
The State also contends that the collection and storage of DNA samples pursuant to the DNA Act serves its "special interest in exonerating the innocent by accurately identifying the perpetrator." The State claims that "[r]apid identification of the perpetrator via use of the convicted offender database will substantially reduce the likelihood that innocent persons will be wrongfully arrested, prosecuted and convicted." The Third Circuit recognized this function of a DNA database as a part of the federal government's compelling interest in the collection of DNA samples from criminal offenders: "Equally important, the DNA samples will help exculpate individuals who are serving sentences of imprisonment for crimes they did not commit and will help to eliminate individuals from suspect lists when crimes occur." Sczubelek, supra, 402 F.3d at 185 (footnote omitted). Thus, while defendant's DNA sample "may inculpate him in the future, it may also exonerate him."[2]Ibid. See also State v. Hogue, 175 N.J. 578, 584-85, 818 A.2d 325 (2003) (concluding that under N.J.S.A. 2A:84A-32a, "any person who was convicted of a crime and is currently serving a term of imprisonment" may make a motion for DNA testing); State v. Halsey, 329 N.J.Super. 553, 559, 748 A.2d 634 (App.Div.) (noting that Rule 3:20-2 "presents a viable means by which a defendant can seek a new trial if he can show that recently improved scientific methodology, [such as DNA testing,] not available at the time of trial, would probably have changed the result" (citation omitted)), certif. denied, 165 N.J. 491, 758 A.2d 650 (2000).
We find that the State has clearly demonstrated special needs beyond the need for normal law enforcement. Our inquiry, however, does not end there. As the Supreme Court advised in New Jersey Transit,
[o]nce the government claims a special need, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties. This fact-specific inquiry requires a court to assess the practicality of the warrant and probable-cause requirements in each particular context. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.
[N.J. Transit, supra, 151 N.J. at 548, 701 A.2d 1243 (internal quotation marks and citations omitted).]
Thus, the special needs test, as outlined by the New Jersey Supreme Court, requires us to apply a balancing test not unlike the "Knights totality of the circumstances test" utilized by the Third Circuit in Sczubelek, supra, 402 F.3d at 184. See Knights, supra, 534 U.S. at 118-19, 122 S.Ct. at 591, 151 L.Ed.2d at 505 ("[T]he reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." (internal quotation marks and citation omitted)). See also Skinner, supra, 489 U.S. at 619, *743 109 S.Ct. at 1414, 103 L.Ed.2d at 661 ("When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context.").
In balancing the governmental interests described above and the privacy interests implicated by obtaining and analyzing an individual's DNA sample, we first note that any intrusion is minimal. See, e.g., Skinner, supra, 489 U.S. at 624, 109 S.Ct. at 1417, 103 L.Ed.2d at 665 ("[T]he intrusion occasioned by a blood test is not significant, since such `tests are a commonplace . . . and the procedure involves virtually no risk, trauma, or pain.'" (quoting Schmerber v. California, supra, 384 U.S. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920)). Second, prisoners and convicted offenders under some other form of supervision have a diminished right to privacy, especially with respect to their identification. See, e.g., Sczubelek, supra, 402 F.3d at 184; Padgett v. Donald, supra, 401 F.3d at 1278-79; Boling v. Romer, supra, 101 F.3d at 1340. Additionally, the DNA Act provides for individual privacy protections: "All DNA profiles and samples submitted . . . shall be treated as confidential," N.J.S.A. 53:1-20.27, and any person with access to "individually identifiable DNA information contained in the State DNA database or databank and who purposely discloses it in any manner to any person or agency not entitled to receive it is guilty of a disorderly persons offense," N.J.S.A. 53:1-20.26.
In light of defendant's reduced expectation of privacy and the privacy protections provided by the DNA Act, we conclude that the minimal intrusion resulting from the collection of a DNA sample is substantially outweighed by the State's need to deter and detect recidivist offenders and the public's interest in promptly identifying and accurately prosecuting the actual perpetrators of crimes. The search compelled by the DNA Act, therefore, is reasonable under both a special needs analysis and the totality of the circumstances test.
Defendant also argues that N.J.S.A. 53:1-20.20(g), which expanded application of the DNA Act to persons convicted of any crime, violates principles of equal protection under the State and Federal Constitutions. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall `deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." Doe v. Poritz, 142 N.J. 1, 91, 662 A.2d 367 (1995) (quoting City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985)). "Equal protection does not preclude the use of classifications, but requires only that those classifications not be arbitrary." Ibid. (citation omitted). Under the Fourteenth Amendment, if a statute neither treats a "suspect" or "semi-suspect" class disparately nor affects a fundamental right, then it will be upheld so long as it is "rationally related to a legitimate government interest." Ibid. (citations omitted). "It is well settled that classifying offenders according to their offense is subject to [this] rational basis analysis." Id. at 92, 662 A.2d 367 (citing State v. Lagares, 127 N.J. 20, 36, 601 A.2d 698 (1992)).
Defendant contends that "an appropriate governmental interest is not suitably furthered by the collection of DNA from persons who have been convicted of non-violent, non-sexual, victimless crimes such as simple possession of drugs." The State, on the other hand, asserts that it has "an interest in deterring and detecting all recidivist acts, not just those considered *744 to be violent." In support of its argument, the State quotes extensively from an Arkansas opinion that highlights data presented by the Director of the Virginia Division of Forensic Science who testified before the House Judiciary Committee concerning the inclusion of non-violent offenders within the scope of Virginia's DNA Act.[3] The State also points to rates of recidivism calculated by the United States Department of Justice, Office of Justice Programs. See Patrick A. Langan & David J. Levin, U.S. Dep't of Justice, Bureau of Justice Statistics, Special Report: Recidivism of Prisoners Released in 1994 (2002) (cited in Ewing v. California, 538 U.S. 11, 26, 123 S.Ct. 1179, 1188, 155 L.Ed.2d 108, 120 (2003)), available at http://www.ojp.usdoj .gov/bjs/abstract/rpr94.htm (last visited Aug. 18, 2005). That report details a study of 272,111 former inmates who were discharged in 1994 from prisons in fifteen states, including New Jersey, representing two-thirds of all the prisoners released in the United States that year. Id. at 1. Within three years of their release, 67.5% were rearrested for a new offense. Ibid. Those with the highest rate of rearrest had been previously convicted for property crimes (73.8%), whereas the lowest rearrest rates were for those previously in prison for homicide and rape. Ibid.
We conclude that the State's interest in deterring and detecting all recidivist acts is rationally related to the requirement that all persons convicted of a crime (as opposed to those convicted of a disorderly persons offense) submit a blood or other biological sample for the purpose of DNA profiling pursuant to N.J.S.A. 53:1-20.20(g). Accordingly, the DNA Act does not violate the Fourteenth Amendment.
"Although the phrase equal protection does not appear in the New Jersey Constitution, it has long been recognized that Article 1, paragraph 1 of the State Constitution, like the [F]ourteenth [A]mendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike." State v. Lagares, supra, 127 N.J. at 34, 601 A.2d 698 (internal quotation marks and citation omitted). To determine whether the DNA Act violates equal protection under the New Jersey Constitution, we must "apply a balancing test which considers the nature of the right affected, the extent to which the government action interferes with that right, and the public need for such interference." Doe, supra, 142 N.J. at 94, 662 A.2d 367. We conclude that the public need to deter and detect all recidivist acts greatly outweighs defendant's limited right to privacy.
Defendant has failed to demonstrate that the DNA Act violates either the Federal or State Constitution. The minimal intrusion mandated by the DNA Act is reasonable given the State's legitimate interests in deterring and detecting all recidivists, accurately identifying criminals, and exonerating the innocent. Moreover, in advancing these interests, the DNA Act promotes justice and public confidence in our criminal justice system.
Affirmed.
NOTES
[1] Defendant does not pursue this argument on appeal. Accordingly, we do not consider or address any issue specifically related to the impact of the statute with respect to a defendant already serving a sentence. We also note that the guilty plea does not waive the issue raised on this appeal concerning the sentence imposed. See State v. Vasquez, 129 N.J. 189, 194, 609 A.2d 29 (1992); State v. Carey, 230 N.J.Super. 402, 404, 553 A.2d 844 (App.Div.1989).
[2] The court noted that "143 people have been exonerated by DNA evidence, thirteen of whom were sentenced to death." Sczubelek, supra, 402 F.3d at 185 n. 4. As of August 24, 2005, 162 people have been exonerated. Innocence Project, available at http://www.innocence project.org (last visited August 24, 2005).
[3] See Va. Dep't of Forensic Science, DNA Database Statistics, at http://www.dfs.virginia.gov/statistics/ index.cfm (last updated July 31, 2005) (asserting that as of July 31, 2005, there had been a total of 2,871 "hits," i.e., when evidence from a crime scene matches a DNA profile, from Virginia's database of 236,034 DNA samples. Of those, "[a]pproximately 38% of violent crimes solved were perpetrated by individuals with previous property crimes," and "[a]pproximately 81% of hits would have been missed if the Databank was limited to only violent offenders.").