890 A.2d 343 (2006)
382 N.J. Super. 605
STATE of New Jersey In the Interest of L.R., Juvenile-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 5, 2005.
Decided January 30, 2006.
*345 Yvonne Smith Segars, Public Defender, for appellant (Kevin G. Byrnes, Designated Counsel, on the brief).
Peter C. Harvey, Attorney General, for respondent, State of New Jersey (Jeanne Screen, Deputy Attorney General, and Janet Flanagan, Deputy Attorney General, of counsel and on the brief).
Before Judges CUFF, LINTNER and GILROY.
The opinion of the court was delivered by
LINTNER, J.A.D.
On March 5, 2003, the Cumberland County Prosecutor's Office filed juvenile complaints charging L.R., K.W., and R.N. with acts which, if committed by an adult, would constitute third-degree criminal mischief, N.J.S.A. 2C:17-3a(1), for scratching the side of an automobile owned by Warren *346 Crescenzo.[1] The complaints were administratively screened and scheduled for a "counsel non-mandatory" proceeding pursuant to the Juvenile Referee Program, R. 5:25-2. Following a two-day hearing on March 28 and April 28, 2003, the referee found there were sufficient facts to adjudicate both K.W. and L.R. delinquent of the charge of criminal mischief. He adjourned disposition for six months and ordered each juvenile to pay restitution of $66 to Crescenzo to reimburse him for his auto insurance deductible and $200 to the Teachers Insurance Plan.[2] The Family Court judge accepted the referee's recommendation and signed an Order on April 28, 2003, finding L.R. guilty of criminal mischief, adjourning disposition for six months, and ordering restitution.
On August 28, 2003, the Cumberland County Prosecutor's Office filed a second juvenile complaint charging L.R. with acts which, if committed by an adult, would constitute third-degree burglary, N.J.S.A. 2C:18-2a(1) (Count One), and third-degree manufacturing or possessing burglar's tools, N.J.S.A. 2C:5-5a(2) (Count Two).[3] On October 2, 2003, L.R. pled guilty to an amended Count One charge, which, if committed by an adult, would constitute criminal trespass contrary to N.J.S.A. 2C:18-3, a disorderly persons offense. Count Two was dismissed pursuant to the plea agreement. The Family Court judge accepted defendant's plea as voluntary, "with advice of counsel and with the agreement of his mother."
That same day, consistent with the plea agreement, the judge sentenced defendant to one year of probation on the trespassing offense. The judge imposed an additional one-year period of probation to run concurrent with the probation imposed on the trespassing offense for reoffending within the six-month period of adjourned disposition. Because the earlier disposition was for a third-degree offense, the judge ordered L.R. to provide a DNA sample. Reserving his right to appeal the DNA sample requirement, the following colloquy took place between the judge and L.R.'s counsel, culminating in the granting of L.R.'s request for a stay of the order requiring him to provide his DNA pending appeal:
THE COURT: All right. So he will have probation for one year and also, because of the degree of criminal mischief, do you understand, sir, by pleading guilty, you will have to be fingerprinted and have a DNA sample?
[L.R.] Yes.
THE COURT: Does that change your mind on the plea?
[L.R.] No.
. . . .
THE COURT: [Room] 252 for a swab in your cheek to have your DNA, since you have now been found guilty of a third degree offense. And the juvenile is responsible for the cost of that test as well.
COUNSEL: Judge, I just want to indicate for the record, and I understand Your Honor's rulingI'm not quarreling it with respect to the DNA. I'm going to indicate that my reading of the statute would be that it should not be given retroactive application. In this particular case, this young man wasn't even before a court. He was adjudicat[ed] by a hearing officer. So I would say that, *347 in this case in particular, it should not really apply since he wasn't adjudicated by a court.
THE COURT: I don'tthe statute doesn't say that, does it?
COUNSEL: Well, I know it doesn't say it but it's a consequence of magnitude, especially the juvenile to be put into a DNA data bank. So what I would say is that other cases where there are consequences of magnitude, when a case isn't heard by a court, consequences of magnitude aren't supposed to flow from them. In other words, if it's heard by a hearing officer, incarceration can't flow from that because he wasn't in front of a court. I would say that having your name, when you're 14 years old, put on a DNA registry is similarly a consequence of magnitude that should not flow from an uncounseled hearing, not in front [of] a jury, ordained or appointed court of law.
THE COURT: However, today, because he was given an adjourned disposition by the hearing officer, he violated that by reoffending during that time. He is now back before a Superior Court judge for sentencing on that and I find it is appropriate, given the degree of the offense, to follow the new statute and require him to deposit his DNA sample.
. . . .
COUNSEL: All right. Just for the record, I also take the position that, in the event that the juvenile may want to appeal on that issue, I'm also objecting on the grounds that it's being given improperly, I would submit, retroactive application. That wasn't a consequence of magnitude, a punishment that was on the table at the time the offense was committed or at the time he was sentenced originally by the hearing officer and now by Your Honor....
THE COURT: I appreciate that, sir.... Even though the offense was committed earlier, the juvenile was on probation for a prior act and comes back before this Court, that that also applies. So had he stayed without new offenses on his adjourned disposition, we wouldn't even be discussing it today but this is a third degree offense. It was reopened. He is now sentenced today, October 2nd, before a Judge of the Superior Court and I am requiring him, per Court Order, to appear in Room 252 today, give his DNA sample, and be responsible for the cost as well as the prior ruling of this Court.
COUNSEL: Judge, whatcould I ask that Your Honor consider staying that matter since the law is so new, to give us an opportunity to appeal on that issue? The young man will be on probation for a period of one year and under the supervision of the Court. I'm not asking that that be stayed. I'm asking that the taking of the swab be stayed to give us an opportunity to appeal that issue.
THE COURT: I will do that, sir. I will stay that on condition that he appear promptly in the event the Appellate Division agrees with this Court.
We need not repeat the facts in detail. The offense forming the basis for the criminal mischief adjudication occurred on March 4, 2003, in the parking lot behind Rossi Intermediate School in Vineland. Crescenzo's 2000 Ford Focus wagon was parked behind the school in what Crescenzo described as "mint condition." L.R., fourteen years old at the time, was outside with K.W. and R.N. They had flat screwdrivers. According to R.N., as they ran past the Ford Focus, they made long scrapes on the driver's side with the screwdrivers. R.N. and K.W. gave their *348 screwdrivers to L.R., who then threw them into the woods.
Keith Howard, a teacher at the school, saw K.W. and R.N. walking next to the car's driver's side, with L.R. walking just ahead of them, all in the same direction. Although Howard did not witness the juveniles scratching the car, he followed them past the car and saw the scratches on it. After the outside activity period, Howard reported the incident to the principal's office.
The school principal advised Crescenzo that a car had been scratched and asked him to verify that it was his car. Crescenzo identified it as his car and the school principal took pictures showing scratches along both the driver's side and the passenger's side, as well as on the front headlights and the rear hatch.
Fred Bianco Body Shop provided Crescenzo with an estimate of the damage in the amount of $1692.92. A copy of the estimate was provided to the referee, the juveniles, and their parents. At the hearing before the referee, Crescenzo confirmed that his vehicle was in "mint condition" prior to the incident. His comprehensive insurance coverage had a $200 deductible.
On appeal, L.R. raises the following points:
I. THE RETROACTIVE APPLICATION OF THE AMENDED DNA STATUTE VIOLATED THE PROSCRIPTION AGAINST THE EX POST FACTO LAWS AND THE JUVENILE'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FEDERAL AND STATE CONSTITUTIONS.
II. THE TAKING OF DNA FOR LAW ENFORCEMENT PURPOSES WITHOUT ANY ARTICULABLE SUSPICION AND WITHOUT A WARRANT VIOLATES THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I PAR. 7 OF THE NEW JERSEY CONSTITUTION. (Not Raised Below.)
III. THE JUVENILE WAS DEPRIVED OF THE RIGHT TO COUNSEL [UNITED STATES CONST. AMEND. VI, NEW JERSEY CONST. ART. I PAR. 10] AT THE HEARING IN WHICH THE FACTS PURPORTEDLY ESTABLISHED THAT HE WAS GUILTY OF CRIMINAL MISCHIEF.
IV. THE ADMISSION OF EVIDENCE OF VALUE OF THE DAMAGE VIOLATED THE JUVENILE'S RIGHT TO CONFRONT WITNESSES AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I PAR. 10 OF THE NEW JERSEY CONSTITUTION AND THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I PAR. 1 OF THE NEW JERSEY CONSTITUTION. (Not Raised Below.)
L.R.'s first two points challenge the constitutionality of the "DNA Database and Databank Act" (the Act), N.J.S.A. 53:1-20.17 to -20.28. In Point I, he asserts that the offense of criminal mischief occurred on March 4, 2003, prior to September 22, 2003, the effective date of N.J.S.A. 53:1-20.20h. He argues, "[t]he order requiring L.R. to provide his DNA sample is a blatant violation of the prohibition against ex post facto laws." We disagree.
Article I, section 10, clause 1 of the United States Constitution declares, "[n]o State shall ... pass any ... ex post facto Law...." Article IV, section VII, paragraph 3 of the New Jersey Constitution *349 imposes a similar proscription, declaring, "[t]he Legislature shall not pass any... ex post facto law ...." These prohibitions apply only to statutes that are penal in nature. Collins v. Youngblood, 497 U.S. 37, 41 n. 2, 110 S.Ct. 2715, 2719 n. 2, 111 L.Ed.2d 30, 38 n. 2 (1990); In re Coruzzi, 95 N.J. 557, 578, 472 A.2d 546, appeal dismissed, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 8 (1984). A statute violates the Ex Post Facto Clause if it imposes a punishment for an act that was not punishable at the time it was committed, imposes additional punishment to that then prescribed, or deprives a defendant of any defense available under the law when the crime was committed. State v. Muhammad, 145 N.J. 23, 56, 678 A.2d 164 (1996); Coruzzi, supra, 95 N.J. at 578, 472 A.2d 546; see also Collins, supra, 497 U.S. at 42-43, 110 S.Ct. at 2719, 111 L.Ed.2d at 39; Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 325-26, 18 L.Ed. 356, 364 (1867); Doe v. Poritz, 142 N.J. 1, 42 n. 10, 662 A.2d 367 (1995) (holding New Jersey's Ex Post Facto Clause subject to same analysis as Federal Clause).
Determining whether a statute is penal by nature requires a two-step analysis: first, whether the legislature intended to impose a criminal punishment, and if not, whether the statute is "so punitive either in purpose or effect," United States v. Ward, 448 U.S. 242, 248-49, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742, 749 (1980), "as to `transform[ ] what was clearly intended as a civil remedy into a criminal penalty,'" id. at 249, 100 S.Ct. at 2641, 65 L.Ed.2d at 750 (quoting Rex Trailer Co. v. United States, 350 U.S. 148, 154, 76 S.Ct. 219, 222, 100 L.Ed. 149, 155 (1956)). "`[O]nly the clearest proof [can] suffice to establish the unconstitutionality of a statute on [the latter] ground.'" Id. at 249, 100 S.Ct. at 2641, 65 L.Ed.2d at 749 (quoting Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435, 1448 (1960)).
To discern the Legislature's intent, we first examine the plain language of the statute. Nobrega v. Edison Glen Assocs., 167 N.J. 520, 536, 772 A.2d 368 (2001). The stated purposes for obtaining the DNA samples are:
a. For law enforcement identification purposes;
b. For development of a population database;
c. To support identification research and protocol development of forensic DNA analysis methods;
d. To assist in the recovery or identification of human remains from mass disasters or for other humanitarian purposes;
e. For research, administrative and quality control purposes;
f. For judicial proceedings, by order of the court, if otherwise admissible pursuant to applicable statutes or rules;
g. For criminal defense purposes, on behalf of a defendant, who shall have access to relevant samples and analyses performed in connection with the case in which the defendant is charged; and
h. For such other purposes as may be required under federal law as a condition for obtaining federal funding.
[N.J.S.A. 53:1-20.21.]
None of these purposes furthers a penal or punishment goal, rather they assist in identification, arrest, investigation, and defense of offenders and victims. Johnson v. Ogershok, 134 F.Appx. 535, 537 (3d Cir. 2005) (upholding Pennsylvania's DNA Act, which requires prisoners convicted of violent offenses to provide a blood sample for the purpose of storing DNA in a database for use by law enforcement officials). The Legislature explained these goals and its reasons for enacting this statute, finding,

*350 DNA databanks are an important tool in criminal investigations and in deterring and detecting recidivist acts. It is the policy of this State to assist federal, state and local criminal justice and law enforcement agencies in the identification and detection of individuals who are the subjects of criminal investigations. It is therefore in the best interest of the State of New Jersey to establish a DNA database and a DNA databank containing blood or other biological samples submitted by every person convicted or found not guilty by reason of insanity of a crime. It is also in the best interest of the State of New Jersey to include in this DNA database and DNA databank blood or other biological samples submitted by juveniles adjudicated delinquent or adjudicated not delinquent by reason of insanity for acts, which if committed by an adult, would constitute a crime.
[N.J.S.A. 53:1-20.18.]
We are satisfied that the Legislature did not intend to impose criminal punishment by requiring convicted offenders to submit a DNA sample. Indeed, as the State argues, the Act does not appear in the Criminal Code but instead in Title 53 dealing with State Police Administration. Accordingly, we focus our attention on the second prong of the test, namely, whether the effect or purpose of the statute is so punitive as to be a criminal penalty regardless of the legislative intent.
Our Supreme Court has elaborated on the judiciary's responsibility in analyzing a statute's constitutionality under the Ex Post Facto Clause, stating:
The ultimate question is whether this statute ... is an impermissible use of government's power to punish, or whether it is an honest, rational exercise of government's power, aimed solely at effecting a remedy, its provisions explainable as addressed to that which is being remedied, its deterrent or punitive impact, if any, a necessary consequence of its remedial provisions. There is a judgment to be made by the courts, not preordained by a calculus, and not dependent on judicial conceptions of policy, but rather a judgment guided by well-established rules. The judiciary's responsibility in these cases is not only to follow those rules, but equally to assure that they do not accomplish what was never intended, striking down a remedial statute passed by ... a Legislature addressing a problem clearly within legislative competence, addressing it rationally, and without any intention of punishing.
[Doe v. Poritz, supra, 142 N.J. at 62-63, 662 A.2d 367.]
As previously explained, the purposes outlined in N.J.S.A. 53:1-20.21 assist in the administration of justice by helping to identify both victims and defendants and aid in both the investigation and defense of criminal conduct. Even if we were to conclude that DNA sampling may be useful in deterring future criminal activity, that alone is not sufficiently penal to trigger ex post facto considerations because deterrence serves multiple goals, including those that are non-punitive. See United States v. Jackson, 189 F.3d 820, 824 (9th Cir.1999). We are satisfied that the Act is not a penal statute and thus its application does not implicate constitutional ex post facto proscriptions.
Defendant next contends that the Act violates his United States Constitution Fourth Amendment and New Jersey Constitution Article 1, paragraph 7 rights against unreasonable search and seizure. To be sure, DNA sampling represents a search. Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639, 660 (1989); *351 Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908, 918 (1966); State v. Ravotto, 169 N.J. 227, 236, 777 A.2d 301 (2001); State in Interest of J.G., 151 N.J. 565, 576, 701 A.2d 1260 (1997); N.J. Transit PBA Local 304 v. N.J. Transit Corp., 151 N.J. 531, 543, 701 A.2d 1243 (1997). The question that must be decided is whether DNA testing under the Act is reasonable, thereby passing constitutional muster. During the pendency of this appeal, another appellate part grappled with the same issue in State v. O'Hagen, 380 N.J.Super. 133, 881 A.2d 733 (App.Div.), certif. granted, 185 N.J. 391, 886 A.2d 661 (2005).
In O'Hagen, the defendant pled guilty to third-degree possession of a controlled dangerous substance and was required to submit a DNA sample. Id. at 138, 881 A.2d 733. On appeal, the defendant argued that the DNA Act violated "his right to be free from unreasonable searches and seizures. . . ."[4]Id. at 138-39. O'Hagen upheld N.J.S.A. 53:1-20.20g as constitutional under the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. Id. at 149, 881 A.2d 733. It concluded that obtaining DNA samples under the Act constituted a "minimal intrusion," which was "substantially outweighed by the State's need to deter and detect recidivist offenders and the public's interest in promptly identifying and accurately prosecuting the actual perpetrators of crimes." Ibid.
Applying the special needs analysis and balancing the totality of the circumstances, O'Hagen determined that the search compelled by the Act was reasonable. Id. at 151, 881 A.2d 733. Determining that the purpose of the Act constituted a "special need," rather than a means to detect ordinary criminal wrongdoing, the O'Hagen panel agreed with the State that "`like fingerprint and photograph identification information,'" a search for DNA "`does not, in and of itself, detect or implicate any criminal wrongdoing.'" Id. at 146, 881 A.2d 733 (quoting State v. Martinez, 276 Kan. 527, 78 P.3d 769, 774 (2003)). Rather, as the State argued, it is authorized for "`obtaining identification information that can be used in the event independent evidence demonstrates that a crime has been committed.'" Id. at 145-46, 881 A.2d 733. Additionally, the O'Hagen panel agreed with the State's position that it has a "`special interest in exonerating the innocent by accurately identifying the perpetrator,'" and the DNA database "`will substantially reduce the likelihood that innocent persons will be wrongfully arrested, prosecuted and convicted.'" Id. at 146-47, 881 A.2d 733.
O'Hagen also determined that the State's interest substantially outweighed the minimal intrusion on convicted offenders' reduced privacy interest in their identities, thus concluding that the search authorized by the Act is reasonable. A person convicted of a crime has a substantially diminished expectation of privacy in his or her identity. Ibid.; see also United States v. Sczubelek, 402 F.3d 175, 178-79 (3d Cir.2005); Martinez, supra, 78 P.3d at 775. Additionally, the intrusion occasioned by a blood test, or a buccal swab, is minimal because "such `tests are . . . a commonplace. . . and . . . the procedure involves virtually no risk, trauma, or pain.'" O'Hagen, supra, 380 N.J.Super. at 148, 881 A.2d 733 (quoting Skinner, supra, 489 U.S. at 625, 109 S.Ct. at 1417, 103 L.Ed.2d at 665). Furthermore, the Act provides *352 for significant privacy protections. Id. at 148-49, 881 A.2d 733. For example, all samples shall be confidential, N.J.S.A. 53:1-20.27, and any person who improperly discloses identifying information is guilty of a disorderly persons offense, N.J.S.A. 53:1-20.26.
The decision in O'Hagen is dispositive, notwithstanding its focus on the adult provisions of the Act. Subsection h of the Act applies to juveniles. Our statute is in accord with other jurisdictions that require juveniles who are adjudicated delinquent to provide a DNA sample. See, e.g., In re Leopoldo L., 209 Ariz. 249, 99 P.3d 578, 584 (Ct.App.2004) (also cited in O'Hagen) (requiring juvenile to submit DNA sample after being adjudicated delinquent and upholding constitutionality of Arizona DNA statute); In re D.L.C., 124 S.W.3d 354, 364-68, 371-73 (Tex.App.2003) (upholding Texas DNA statute as applied to juveniles with respect to the Ex Post Facto Clause and the Fourth Amendment); L.S. v. State, 805 So.2d 1004, 1005, 1005 n. 1 (Fla. Dist.Ct.App.2001) (upholding Florida DNA statute as applied to juveniles), review denied, 821 So.2d 297 (Fla.2002); In re Welfare of C.C.F., No. C3-97-552, 1997 WL 714701, 1997 Minn.App. Lexis 1255, at *1-2 (Minn.Ct.App. Nov. 18, 1997) (unpublished opinion). The Act does not suffer the constitutional infirmities urged by L.R. on appeal.
L.R. next argues that the order requiring him to submit a DNA sample should be reversed because he did not have counsel at the hearing before the referee that resulted in the disposition finding him guilty of a third-degree offense, thereby subjecting him to DNA testing under the Act. In 1967, the United States Supreme Court declared, "the assistance of counsel is essential . . . for the determination of delinquency, carrying with it the awesome prospect of incarceration in a state institution. . . ." In re Gault, 387 U.S. 1, 36-37, 87 S.Ct. 1428, 1448, 18 L.Ed.2d 527, 551 (1967). The New Jersey Legislature codified this principle in N.J.S.A. 2A:4A-39a, declaring, "[a] juvenile shall have the right, as provided by the Rules of Court, to be represented by counsel at every critical stage in the proceeding which . . . may result in the institutional commitment of the juvenile." (emphasis added). R. 5:3-4(a) similarly states,
In family matters . . . if counsel is not otherwise provided for the family and if the matter may result in the institutional commitment or other consequence of magnitude to any family member, or if any family member is constitutionally or by law entitled to counsel, the court shall refer the family member to the Office of the Public Defender, if appropriate, or assign other counsel to represent the juvenile or family member. (emphasis added).
R. 5:25-2 provides in pertinent part, "[t]he recommendations of the referee shall be without effect unless approved by the court and incorporated in an appropriate order or judgment of the court." Thus, this "rule provision requiring approval by the court and incorporation of the referee's recommendation in an appropriate order or judgment of the court renders the delegation of fact-finding by a non-jurist a nullity absent formal [court] ratification." State ex rel. A.H., 304 N.J.Super. 34, 40, 697 A.2d 964 (Ch.Div.1997). Moreover, a referee is precluded from recommending a disposition which would result in incarceration.[5] Thus, L.R. was not at risk of incarceration *353 following the R. 5:25-2 referee hearing for criminal mischief.
In State v. In the Interest of G.J., 108 N.J.Super. 186, 260 A.2d 513 (App.Div.1969), certif. denied, 55 N.J. 447, 262 A.2d 702 (1970), a juvenile did not have counsel at an initial hearing where the juvenile was adjudicated delinquent and placed on probation, nor at two subsequent hearings where the juvenile was found to have violated probation, but which did not result in commitment to an institution. Id. at 187-88, 260 A.2d 513. Like the circumstances here, however, the juvenile in G.J. was represented by counsel at a fourth hearing in which she was again found to have violated probation and was institutionally committed. We held that the absence of counsel at the earlier informal hearings was harmless beyond a reasonable doubt because the juvenile was represented at the subsequent hearing on which commitment was based. Id. at 188, 260 A.2d 513. We suggest
that in the future, where a violation of probation has occurred and the original probationary order was imposed on the juvenile without the benefit of counsel at the hearing, the subsequent conduct constituting violation of probation be incorporated in a new complaint . . . to be heard on the formal calendar with counsel.
[Id. at 189, 260 A.2d 513.]
Here, L.R. was represented by counsel at the formal hearing at which he was charged with subsequent offenses, but pled guilty to a lesser charge, and probation was imposed. He was not subject to DNA sampling following the first hearing because the Act had not been amended as of that time. Probation was imposed for the first time following the second offense and he was not committed to a juvenile institution. It was not until the second hearing when he was represented by counsel that he became subject to DNA sampling, albeit as a result of the earlier disposition. Thus, we are satisfied that, like the circumstances in G.J., the absence of counsel at L.R.'s prior hearing was harmless. Beyond that, because we have already concluded that DNA sampling is not penal in nature, it is not a "consequence of magnitude" or the equivalence of institutionalization requiring representation by counsel.
Finally, we address L.R.'s argument that the admission of the damage estimate was hearsay evidence that violated his constitutional right to confront the person who prepared the estimate. Although, under the plain error rule, we will consider allegations of error that have a clear capacity to produce an unjust result not brought to the trial court's attention, R. 2:10-2; State v. Macon, 57 N.J. 325, 337-39, 273 A.2d 1 (1971), we generally decline to consider issues that were not presented at trial, Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 230, 708 A.2d 401 (1998); Saul v. Midlantic Nat'l Bank/South, 240 N.J.Super. 62, 82, 572 A.2d 650 (App.Div.), certif. denied, 122 N.J. 319, 585 A.2d 338 (1990). It is well settled that "[q]uestions not raised below `will ordinarily not be considered on appeal.'" State v. Cryan, 320 N.J.Super. 325, 332, 727 A.2d 93 (App.Div.1999) (quoting State v. Bobo, 222 N.J.Super. 30, 33, 535 A.2d 983 (App. Div.1987)); see also State v. Lakomy, 126 N.J.Super. 430, 437, 315 A.2d 46 (App.Div. 1974).
We also note that L.R. did not file a timely appeal following entry of the April 28, 2003, Family Court Order accepting the referee's recommendation and finding L.R. delinquent of committing the offense of criminal mischief. We therefore conclude *354 that the issue raised is not properly before us on appeal.
Nevertheless, we make the following additional observations. The admission of the estimate, though hearsay, was proper because there was no objection. The record reveals that, prior to considering the estimate, the referee had it marked for identification and given to L.R. and his mother for their review. They did not object to its admission nor did they have any questions for Crescenzo. Had there been an objection, the estimate may have been otherwise admitted under the business records exception, N.J.R.E. 803(c)(6). Nontestimonial evidence that falls within "[a]n established and recognized exception to the hearsay rule will not necessarily run afoul of the Confrontation Clause." State v. Branch, 182 N.J. 338, 349, 865 A.2d 673 (2005); see Crawford v. Washington, 541 U.S. 36, 59, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177, 197 (2004); White v. Illinois, 502 U.S. 346, 355 n. 8, 112 S.Ct. 736, 742 n. 8, 116 L.Ed.2d 848, 859 n. 8 (1992); Idaho v. Wright, 497 U.S. 805, 816-17, 110 S.Ct. 3139, 3147-48, 111 L.Ed.2d 638, 653-54 (1990); State v. Miller, 170 N.J. 417, 426, 790 A.2d 144 (2002). Further, the rules of evidence may be relaxed in a "juvenile delinquency action in which information is presented for the court's use in . . . other diversionary proceedings." N.J.R.E. 101(a)(2)(C). Under these circumstances, we are convinced that it would offend the interests of justice to require a rerun of the proceedings in which L.R. was adjudicated delinquent of committing criminal mischief. See Macon, supra, 57 N.J. at 333, 273 A.2d 1.
Affirmed.
NOTES
[1] R.N. pled to the charge.
[2] L.R. was ordered to pay restitution at a rate of fifty dollars per month.
[3] As the State notes in its brief, although the complaint stated that manufacturing or possessing burglar's tools is a third-degree crime, it is a fourth-degree crime, N.J.S.A. 2C:5-5.
[4] At trial, O'Hagen objected to DNA testing because his offense occurred prior to the Act's effective date, but he did not pursue that argument on appeal. Id. at 138, 881 A.2d 733.
[5] The Juvenile Referee Program Standards provide that a referee may "recommend any of the dispositional alternatives available under N.J.S.A. 2A:4A-43b, with the exception of N.J.S.A. 2A:4A:43b(4), (5), (6), and (7)," which provide for incarceration. Supreme Court of New Jersey, Revised Juvenile Referee Program Standards (Dec. 10, 2002). (emphasis added).