894 A.2d 31 (2006)
384 N.J. Super. 67
A.A., by his parent and guardian B.A., and Jamaal W. Allah, Plaintiffs-Respondents,
v.
ATTORNEY GENERAL OF NEW JERSEY and The New Jersey Department of Corrections, Defendants-Appellants, and
Mercer County Probation Services, Defendant.
A.A., by his parent and guardian B.A., and Jamaal W. Allah, Plaintiffs-Appellants,
v.
Attorney General of New Jersey and The New Jersey Department of Corrections, Defendants-Respondents, and
Mercer County Probation Services, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 2005.
Decided March 17, 2006.
*37 Larry Etzweiler, Senior Deputy Attorney General, argued the cause for appellants in A-2320-04T3; respondents in A-2671-04T3 (Peter C. Harvey, Attorney General, attorney; Patricia Prezioso and Patrick DeAlmeida, Assistant Attorneys General, of counsel; Mr. Etzweiler, Janet Flanagan and Tamara L. Rudow, Deputy Attorneys General, on the brief).
Lawrence S. Lustberg, Newark, argued the cause for respondents in A-2320-04T3; appellants in A-2671-04T3 (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. Lustberg and Gitanjali S. Gutierrez, on the brief).
American Civil Liberties Union of New Jersey, co-counsel for respondents in A-2320-04T3; appellants in A-2671-04T3 (Edward L. Barocas, on the brief).
Before Judges STERN, PARKER and GRALL.
*38 The opinion of the court was delivered by
GRALL, J.A.D.
This appeal is from a final order in a declaratory judgment action concerning the constitutionality of the DNA Database and Databank Act of 1994 (the Act), N.J.S.A. 53:1-20.17 to -20.28, as amended by L. 2003, c. 183, § 1. The Act establishes a databank and database consisting of biological samples and DNA profiles of certain offenders. N.J.S.A. 53:1-20.20g, h; N.J.S.A. 53:1-20.21. Its purpose is to provide "an important tool in criminal investigations and in deterring and detecting recidivist acts." N.J.S.A. 53:1-20.18.

I.
Plaintiffs, A.A., by his parent and guardian B.A., and Jamaal W. Allah became subject to the Act when it was amended, effective September 22, 2003, to require any person serving a sentence of supervision as a consequence of conviction or adjudication of delinquency based on conduct classified as a crime to submit a biological sample. N.J.S.A. 53:1-20.20g, h; see L. 2003, c. 118.[1] On that date, Allah was serving a sentence of incarceration as a result of two convictions for possession of a controlled dangerous substance with intent to distribute, contrary to N.J.S.A. 2C:35-5, one for a crime of the second degree and one for a crime of the third degree. N.J.S.A. 2C:35-5b (2)-(3). On the same date, A.A. was on probation as a result of an adjudication of delinquency based upon conduct that would have constituted aggravated assault contrary to N.J.S.A. 2C:12-1b(5)(a) if A.A. had been eighteen rather than fourteen years of age at the time of the assault.
On January 22, 2004, plaintiffs filed a complaint for injunctive and declaratory relief. They named as defendants the Attorney General, who is responsible for administering the Act through the Division of State Police (division), as well as the Department of Corrections and the Mercer County Probation Services, two of the entities that collect biological samples from offenders.[2] Plaintiffs alleged that the Act exceeds constitutional limitations on searches and ex post facto laws and deprives them of due process of law. U.S. Const. art. I, § 10, cl. 1; U.S. Const. amends. IV, XIV; N.J. Const. art. I, ¶¶ 1, 7 and N.J. Const. art. IV, § 7, ¶ 3. The issues were decided on the basis of briefs and certifications, including documentary evidence.
For reasons stated in a thoughtful opinion, the trial judge held that the Act would deprive offenders of due process and permit unreasonable searches unless modified to include a right of expungement upon completion of sentence. As a corollary to that right, the judge further precluded the State defendants from sharing an offender profile with any agency that will not purge its database upon receipt of an expungement order.[3] The judge rejected plaintiffs' ex post facto claims.
*39 The Attorney General and the Department of Corrections (collectively defendants) filed a notice of appeal; plaintiffs too filed a notice of appeal. The trial judge filed a supplemental opinion. We granted defendants' motion to consolidate and accelerate the appeals.
Defendants contend that neither the State nor Federal Constitutions require the expungement remedy the trial court fashioned. Plaintiffs contend that even with that remedy, the Act permits searches that are constitutionally unreasonable. Alternatively, they argue that without post-sentence expungement the Act would not only permit unreasonable searches but also deprive them of procedural and substantive due process and the fundamental fairness guaranteed by the State Constitution.[4]
We discuss the Act and its implementation in Section II. We have the benefit of a full record describing the collection, testing and retesting, and dissemination of DNA profiles and identifying information.
In Section III we discuss the reasonableness of the searches authorized by the Act and hold that establishment of the system for identification of offenders required by this Act is a "special need[], beyond the normal need for law enforcement," and that the searches and seizures authorized meet the reasonableness requirement of the Federal and State Constitutions, at least when applied to adults and juveniles over the age of fourteen at the time of the predicate act. See Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709, 717 (1987). This aspect of our decision is informed by State v. O'Hagen, 380 N.J.Super. 133, 881 A.2d 733 (App.Div.), certif. granted, 185 N.J. 391, 886 A.2d 661 (2005) and In re L.R., 382 N.J.Super. 605, 890 A.2d 343 (App.Div.2006), which were decided after the trial judge's ruling and hold that the searches are reasonable. L.R., supra, 382 N.J.Super. at 619, 890 A.2d 343 (rejecting challenge by a juvenile over the age of fourteen); O'Hagen, supra, 380 N.J.Super. at 145-51, 881 A.2d 733 (rejecting adult offender's claims of unreasonable search and denial of equal protection).
The Act's requirement for promulgation of rules governing testing and access to DNA profiles is essential to our conclusion that the statutory scheme is reasonable and constitutional. In Section IV we hold that the division must adopt those rules in accordance with the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15.
Section V provides our reasons for concluding that neither the constitutional prohibition against unreasonable searches nor principles of due process or fundamental fairness permit or require a judicial expungement remedy.

II.
New Jersey's Act is not unique. Each of the fifty states and Congress have adopted comparable statutes that provide a means for law enforcement agencies to maintain and share DNA profiles of offenders. See O'Hagen, supra, 380 N.J.Super. at 142-43, 881 A.2d 733.
The Legislature has provided a clear statement of its reasons for establishing this identification system:
The Legislature finds and declares that DNA databanks are an important tool in criminal investigations and in deterring and detecting recidivist acts. It is the *40 policy of this State to assist federal, state and local criminal justice and law enforcement agencies in the identification and detection of individuals who are the subjects of criminal investigations. It is therefore in the best interest of the State of New Jersey to establish a DNA database and a DNA databank containing blood or other biological samples submitted by every person convicted or found not guilty by [specified offenders]....
[N.J.S.A. 53:1-20.18.]
The Act requires any person convicted, adjudicated delinquent or found not guilty by reason of insanity on the basis of conduct defined as a crime to "have a blood sample drawn or other biological samples collected for purposes of DNA [deoxyribonucleic acid] testing." N.J.S.A. 53:1-20.20g-h; N.J.S.A. 53:1-20.19. A crime is any offense subject to a term of imprisonment in excess of six months. N.J.S.A. 2C:1-4a. For ease of reference, we employ the term "offenders" to denote collectively persons convicted and adjudicated delinquent on the basis of conduct defined as a crime.[5]
The collection is performed by trained personnel. N.J.S.A. 53:1-20.22. It is done once; an offender who previously has submitted an adequate biological sample following a prior adjudication or conviction is exempt from a second collection. Ibid. In most cases, samples are acquired with a "buccal swab," a foam receptor that the offender rubs between his or her teeth and cheek and holds under the tongue. The swab is rolled on a card that changes color upon successful transfer.[6] That card is the biological sample that is retained in the databank.
The biological samples are sent to the division and logged by bar code. Each sample is "securely stored" in the "State DNA databank" maintained by the division. N.J.S.A. 53:1-20.21; N.J.S.A. 53:1-20.23.
Each biological sample must be tested "in order to analyze and type the genetic markers." N.J.S.A. 53:1-20.21. The division must employ an "identification system... compatible with that utilized by the FBI." N.J.S.A. 53:1-20.23. The resulting DNA profiles must be "securely stored in the State database," which is administered by the division, and "forwarded to the FBI for inclusion in" the FBI's national DNA identification index system.[7]N.J.S.A. 53:1-20.19; N.J.S.A. 53:1-20.21; N.J.S.A. 53:1-20.23.
The "analysis" and "typing of genetic markers" conducted pursuant to this Act were explained by Linda B. Jankowski, M.S., the biologist responsible for oversight of the State Police DNA Laboratory and the Combined DNA Index System (CODIS) Unit. Thomas F. Callaghan, Ph. D., Custodian for the National DNA Index System (NDIS) and Chairman of its Procedures Board, described the testing and procedures for inter-state exchange of profiles and information identifying the donor of a profile.
*41 A sample is tested by measuring "tetra-nucleotide repeats, also [known] as short tandem repeats (`STR's'), at each of thirteen specific regions on the human genome." According to defendants' experts, the "test cannot be used to determine any personal information, individual characteristics, or presenting or latent health defects...." The "thirteen loci are the international standard in DNA testing." Because the "regions are highly variable between individuals, ... this test is ... considered one of the most reliable tests for identification known in forensic science today." The resulting profile is a series of numbers.[8]
As defendants' experts explained, offender profiles in the DNA State or National database do not include any information identifying the person by name. The offender's "biographical data" (e.g., name, date of birth) is kept in a separate system that is linked to the profile only by a "bar code." The numeric DNA profiles, without identifying information, are the data that comprise the Convicted Offender Index. Agencies also maintain a separate Forensic Index that includes DNA developed from samples collected at crime scenes.
The Act requires the division to adopt "rules governing the procedures to be used in the submission, identification, analysis and storage of DNA samples and typing results of DNA samples submitted...." N.J.S.A. 53:1-20.23.[9]
Access to DNA profiles of offenders is statutorily limited. "All DNA profiles and samples ... shall be treated as confidential except as provided in [N.J.S.A. 53:1-20.24]." N.J.S.A. 53:1-20.27. The authorizing statute permits access in two circumstances: upon request from a law enforcement agency "in furtherance of an official investigation of a criminal offense" and when authorized by court order.[10]N.J.S.A. 53:1-20.24a. Access is further circumscribed by subsection b of N.J.S.A. 53:1-20.24, which requires the division to "adopt rules governing the methods of obtaining information from the State database and CODIS and procedures for verification of the identity and authority of the requestor."[11]
*42 By virtue of N.J.S.A. 53:1-20.24, a court order is needed before the division may give any person, other than a law enforcement agent in connection with an official criminal investigation, access to DNA profiles in the database. Thus, other uses of "test results" authorized by N.J.S.A. 53:1-20.21"research"; "judicial proceedings"; "criminal defense purposes"; "identification of human remains from mass disasters" and "other purposes as may be required under federal law as a condition for obtaining federal funding"all require a court order. Unauthorized disclosure or dissemination of information included in the database is punishable as a disorderly persons offense. N.J.S.A. 53:1-20.26.
The Act does not limit the time during which an offender's profile and sample may be retained. It provides a right of expungement limited to an offender whose underlying charge is dismissed after reversal of his or her conviction or adjudication. N.J.S.A. 53:1-20.25.[12]
The extension of this Act to include all persons convicted or adjudicated delinquent on the basis of conduct defined as a crime led to this litigation. The legislative history includes an explanation for the expansion of the Act. The sponsor of the bill explained that the goal was to "enhance the ability of law enforcement to solve crimes." Statement of the Senate Budget and Appropriations Committee to Assembly Bill No. 2617 (2003). He noted that "[o]ther states which collect DNA samples for a wider range of crimes have experienced a large increase in database `hits,' particularly with respect to property crimes, such as burglary and robbery." Ibid.
As defendants' experts explained, the STR technology now employed in DNA profiling permits development of a profile from very small biological samples, "10,000 nanograms or less." As a result, forensic profiles can be developed from "chewing gum, cigarette butts, drinking cups and bottles, clothing, eyeglasses, or just about any item that comes into substantial contact with sweat, skin, saliva, blood, semen, or any other bodily fluid."
Defendants presented the results of a recidivism study that followed 272,111 prisoners released in 1994 from prisons in fifteen states, one of which was New Jersey. Patrick A. Lanagan and David J. Levin, U.S. Dept. of Justice, Bureau of Justice Statistics, Special Report: Recidivism of Prisoners Released in 1994, p. 1 (June 2002). Of those prisoners, 81.4% had convictions prior to the one for which they were incarcerated. Id. at 2. Within three years of release, 46.9% of the prisoners had been convicted of a new crime. Id. at 3. Offenders that had been incarcerated for property crimes, such as burglary, auto theft and fraud, had the highest rate of rearrest, 73.8%, and drug offenders were second, with a rearrest rate of 66.7%. Id. at 8.

III.

A. General Principles
The State and Federal Constitutions prohibit any search or seizure that is unreasonable. U.S. Const. amends. IV, XIV; N.J. Const. art. I, ¶ 7. The purpose of the constitutional prohibition is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967). This is "a right of the people which is basic to a free society." Ibid. (internal quotations omitted). *43 It is fundamental that "no Act [no matter its popularity or practicality] can authorize a violation." Almeida-Sanchez v. United States, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596, 602 (1973). No state or federal appellate court that has considered the reasonableness of a DNA database statute has found a violation of this basic right. See Nicholas v. Goord, 430 F.3d 652, 658-59 (2d Cir.2005); see, e.g., United States v. Sczubelek, 402 F.3d 175, 184 (3d Cir.2005) (federal); Padgett v. Donald, 401 F.3d 1273, 1278 (11th Cir.2005) (Georgia act); State v. Raines, 383 Md. 1, 857 A.2d 19, 26-27 (2004) (Maryland act); see also United States v. Kincade, 379 F.3d 813, 830-31, 831 n. 25 (9th Cir.2004) (en banc) (listing and discussing decisions issued prior to that decision and overruling a panel decision finding a constitutional violation); L.R., supra, 382 N.J.Super. at 617-19, 890 A.2d 343; O'Hagen, supra, 380 N.J.Super. at 145-51, 881 A.2d 733; Raines, supra, 857 A.2d at 25-27 (listing cases).[13]
The collection and testing of a biological sample entails a seizure and search which must be "reasonable" within the meaning of the Fourth Amendment and Article I, paragraph 7 of the New Jersey Constitution. Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 615-17, 617 n. 4, 109 S.Ct. 1402, 1412-1413, 1413 n. 4, 103 L.Ed.2d 639, 660, 660 n. 4 (1989); Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J. 568, 590, 826 A.2d 624 (2003); O'Hagen, supra, 380 N.J.Super. at 141, 881 A.2d 733.
Because the Act, like comparable statutes, authorizes the collection and testing of biological samples on the basis of a prior conviction or adjudication alone, the issue is whether the intrusions are consistent with an exception to the warrant requirement. Sczubelek, supra, 402 F.3d at 182; Green v. Berge, 354 F.3d 675, 677 (7th Cir.2004); see Skinner, supra, 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661; Joye, supra, 176 N.J. at 590, 826 A.2d 624. Because this Act does not require even individualized suspicion that a profile will produce evidence, the intrusions must fall within the "closely guarded" category of permissible suspicionless searches. Chandler v. Miller, 520 U.S. 305, 309, 117 S.Ct. 1295, 1298, 137 L.Ed.2d 513, 520 (1997).

B. The "Special Needs" Exception
In O'Hagen and L.R. this court held that the DNA testing mandated by this Act falls within the "special needs" exception to the warrant requirement. L.R., supra, 382 N.J.Super. at 618, 890 A.2d 343; O'Hagen, supra, 380 N.J.Super. at 145-49, 881 A.2d 733. Other courts have upheld similar statutes on the same basis. See, e.g., Nicholas, supra, 430 F.3d at 658-59; Green, supra, 354 F.3d at 677-78; United States v. Kimler, 335 F.3d 1132, 1146 (10th Cir.2003).[14] We agree with that conclusion.
*44 Searches conducted pursuant to "reasonable legislative or administrative standards" that further "special needs, beyond the normal need for law enforcement" are excepted from the warrant requirement of the Federal and State Constitutions. See Griffin, supra, 483 U.S. at 873, 107 S.Ct. at 3168, 97 L.Ed.2d at 717; Treasury Employees v. Von Raab, 489 U.S. 656, 674-75, 109 S.Ct. 1384, 1395, 103 L.Ed.2d 685, 708 (1989); Joye, supra, 176 N.J. at 590, 593-94, 826 A.2d 624 (applying the New Jersey Constitution). When a neutral statute or regulation authorizes searches that further a "special need," the question is whether a balancing of the governmental interests and the nature of the intrusion upon the individual's reasonable expectations of privacy demonstrates that the search is "reasonable" under all the circumstances. Von Raab, supra, 489 U.S. at 665-66, 109 S.Ct. at 1390-91, 103 L.Ed.2d at 702-03; Joye, supra, 176 N.J. at 597, 826 A.2d 624 (assessing reasonableness by weighing the individual's "expectation of privacy," the "obtrusiveness" of the search and "the strength of the government's asserted need").[15] Thus, the "special needs" exception is more rigorous than exceptions that depend only upon an assessment of reasonableness under the totality of the circumstances; that is so because the test requires both a "special need" and a determination that the "special need" outweighs the individual's privacy interest. Nicholas, supra, 430 F.3d at 664 n. 22.
Plaintiffs argue that the "special needs" exception cannot be applied here because the Act's purpose is to provide a tool for law enforcement. N.J.S.A. 53:1-20.18. There is some support for that argument. Kincade, supra, 379 F.3d at 854-59 (Reinhardt, J., dissenting); cf. Sczubelek, supra, 402 F.3d at 184 (concluding that the special need is supervision on probation and declining to apply the "special needs" exception because DNA is retained beyond probation). We conclude, however, that plaintiffs' claim is based on an unduly broad reading of decisions that have limited relevance here and a failure to address other relevant precedents. See Green, supra, 354 F.3d at 678-79. "[G]eneral language in judicial decisions [should be read] as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." See Illinois v. Lidster, *45 540 U.S. 419, 424, 124 S.Ct. 885, 889, 157 L.Ed.2d 843, 851 (2004).
The Supreme Court explained that "special needs" means something other than the "normal need for law enforcement" in Von Raab, a case approving drug testing of certain customs agents related to their employment. 489 U.S. at 662-63, 109 S.Ct. at 1389, 103 L.Ed.2d at 700. But a year after Von Raab, in Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412, 420 (1990), the Court approved a program of sobriety checkpoints established by law enforcement officers to detect and deter drunk driving. The Court expressly rejected the claim that the state was required to show a "need `beyond the normal need' for criminal law enforcement." Ibid. (noting that Von Raab "was in no way designed to repudiate [] prior cases dealing with police stops of motorists on public highways, which utilized a balancing analysis in approving highway checkpoints" (citations omitted)). Sitz demonstrates that Von Raab cannot be read to bar reliance on "special needs" whenever there is a law enforcement purpose. See Nicholas, supra, 430 F.3d at 679 (Lynch, J. concurring) (joining the court in concluding that New York's DNA law serves special needs and noting that "the line is thin between law enforcement's looking for drunk drivers to protect the public, and looking for evidence of drunk driving to support a criminal prosecution").
If there were any doubt about the impropriety of an overly broad reading of Von Raab's reference to law enforcement purposes after Sitz, Illinois v. Lidster further clarifies the point. Lidster, supra, 540 U.S. at 423-24, 124 S.Ct. at 889, 157 L.Ed.2d at 850. In that case, the Court held that "special law enforcement concerns will sometimes justify" intrusions and found "reasonable" a roadblock established to question motorists who might have information about a fatality. Id. at 427, 124 S.Ct. at 890-91, 157 L.Ed.2d at 852.
Plaintiffs rely on two cases in which the Court invalidated programs established by the police to search members of the general public for evidence of drug crimes. In Indianapolis v. Edmond, 531 U.S. 32, 41-42, 121 S.Ct. 447, 454, 148 L.Ed.2d 333, 343 (2000), the Court found "unreasonable" a roadblock set-up to allow drug-sniffing dogs to examine the exterior of cars and held that the "special needs exception" did not apply because the roadblock was established to "detect evidence of ordinary criminal wrongdoing." In Ferguson v. City of Charleston, 532 U.S. 67, 81-82, 85 n. 24, 121 S.Ct. 1281, 1290, 1292 n. 24, 149 L.Ed.2d 205, 219, 221 n. 24 (2001), the Court invalidated a program to screen for drugs the urine of pregnant women who sought medical care and reasoned that the "immediate objective" of the law-enforcement program was "to generate evidence for law enforcement purposes," a goal it deemed "indistinguishable from the general interest in crime control."[16]
There are more differences than similarities between the Act we review and the discretionary law enforcement programs established in Ferguson and Edmond. This Act and comparable DNA statutes are limited to offenders who have engaged in conduct defined as a crime. Following their convictions or adjudications of delinquency on that basis, their identity is a matter of legitimate interest to the government. *46 Sczubelek, supra, 402 F.3d at 184. Establishment of a database to permit law enforcement to obtain and share DNA profiles of such offenders is a "special need" different than searches for evidence of crime among the general public. Green, supra, 354 F.3d at 677; Kimler, supra, 335 F.3d at 1146.[17]
This Act is about collection and maintenance of information identifying offenders, after guilt is established, in order to detect and deter their recidivist acts, should there be any; it is not about law enforcement officers electing to search the general population with the hope of detecting criminal activity as in Ferguson and Edmond. Kincade, supra, 379 F.3d at 839 n. 39 (noting that testing required by statute and based upon conviction precludes arbitrary, capricious, harassing and illegitimate searches). The program established by this Act is based on the Legislature's assessment of the problem of recidivism, the need to bring violators to justice and the costs and benefits of participating in a National system of criminal identification. N.J.S.A. 53:1-20.18.
The Supreme Court's decision in Griffin is more instructive than Ferguson and Edmond in considering this Act. In Griffin, the Court held that the "special need" of supervising persons on probation "permit[s] a degree of impingement upon privacy that would not be constitutional if applied to the public at large" and upheld a search of a probationer's home conducted pursuant to a reasonable regulation of the probation department responsible for the offender's supervision. Griffin, supra, 483 U.S. at 873-75, 107 S.Ct. at 3168-69, 97 L.Ed.2d at 717-18. The Court explained that the reasons for authorizing "special needs" and "administrative" searches are "similar" and reasoned that the government's "operation of a probation system," like its "operation of a school, government office or prison, or its supervision of a regulated industry, [] presents `special needs' beyond normal law enforcement." Ibid.
Griffin relies on an earlier case involving an administrative search, United States v. Biswell, 406 U.S. 311, 315-16, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87, 92 (1972). In that case, the Court upheld a federal statute authorizing warrantless inspections of licensed firearms dealers because of their importance to "assist[ing] the States in regulating the firearms traffic within their borders" and ensuring the transfer of firearms in "a traceable manner." Ibid. The New Jersey Supreme Court also has likened searches based on "special needs" and "administrative searches." Joye, supra, 176 N.J. at 637-38, 826 A.2d 624 (citing In re Martin, 90 N.J. 295, 310-16, 447 A.2d 1290 (1982), which involved searches related to the casino industry). The common feature of these well-recognized exceptions to the warrant requirement is that the persons subject to search are distinguished from members of the general public by conduct related to the search.
The purpose and scope of the searches authorized by this Act is similar to the purpose and scope in Griffin, curbing recidivism of probationers, and Biswell, preventing and detecting crime by regulating *47 and tracing firearms sales. Griffin, supra, 483 U.S. at 875, 107 S.Ct. at 3169, 97 L.Ed.2d at 718; Biswell, supra, 406 U.S. at 315-16, 92 S.Ct. at 1596, 32 L.Ed.2d at 92; see Green, supra, 354 F.3d at 677 (likening administrative and special needs searches in approving DNA statute). Here the purpose is deterring and detecting recidivist acts of prior offenders. N.J.S.A. 53:1-20.18; see Kimler, supra, 335 F.3d at 1146.[18]
Our review of the decisions leads us to conclude that "special law enforcement concerns" furthered by this Act support rather than bar application of the "special needs" exception. The need beyond ordinary law enforcement is establishment of a database that will allow officers throughout the state and country to link prior offenders with forensic evidence and thereby detect recidivism and deter offenders who will know about this tool. See N.J.S.A. 53:1-20.18. The potential to use fingerprints in detecting the perpetrators of unsolved crimes has long been recognized as a justification for not a bar to collection and retention of that data: "[f]ingerprints and photographs are useful means for the recapture of escaped prisoners and detection of second offenders...." McGovern v. Van Riper, 137 N.J. Eq. 548, 549-50, 45 A.2d 842 (E. & A.1946); Roesch v. Ferber, 48 N.J.Super. 231, 234-50, 137 A.2d 61 (App.Div.1957) (discussing common law and statutory law authorizing fingerprinting); see N.J.S.A. 2A:4A-61; N.J.S.A. 53:1-15; Kincade, supra, 379 F.3d at 873-74 (Kozinski, J. dissenting) (discussing the development of the FBI's Integrated Automated Fingerprint Identification System). When compared with fingerprinting, collection and retention of DNA involves a greater intrusion and greater potential for disclosure of information in which law enforcement has no legitimate interest, but the "special need" furthered is the same. Nicholas, supra, 430 F.3d at 671 n. 31. There is no authority for the proposition that Edmond, Ferguson and Von Raab invalidate statutes that permit law enforcement officers to collect and share offenders' fingerprints.[19]
For all these reasons, we join the courts that have concluded that DNA statutes comparable to this Act further a special need beyond the ordinary law enforcement objective of crime detection. Nicholas, supra, 430 F.3d at 668-69; Green, supra, 354 F.3d at 678; Kimler, supra, 335 F.3d at 1146; L.R., supra, 382 N.J.Super. at 619, 890 A.2d 343; O'Hagen, supra, 380 *48 N.J.Super. at 146-47, 881 A.2d 733. The question that remains is whether that need is sufficient to justify the intrusions on the privacy of offenders. See Nicholas, supra, 430 F.3d at 666-67.

C. The Act strikes a reasonable balance between the compelling special needs it furthers and the related invasions of privacy reasonably expected by the offenders.
Having determined that the "special law enforcement concerns" furthered by this Act qualify as "special needs," we consider whether the identification program established is "reasonable" when "the strength of the government's asserted need," the individual's "expectation of privacy" and the "obtrusiveness" of the searches are weighed. Joye, supra, 176 N.J. at 594, 597, 826 A.2d 624.

1. The government's interests are compelling.
Recidivism is a serious problem, and the state's interest in detecting and deterring it is "undeniably compelling." Kincade, supra, 379 F.3d at 838-39. The statistics presented below and discussed in Section II demonstrate the gravity of the concern.
Deterrence, including deterrence of recidivist acts, is a central component of New Jersey's sentencing system. Its importance is reflected in the numerous sentencing laws that permit or require enhanced punishment for repeat offenders. See, e.g., N.J.S.A. 2C:1-2b(2)-(3); N.J.S.A. 2C:44-1a(3), (6), (9); N.J.S.A. 2C:43-6c, e, f, g; N.J.S.A. 2C:44-3a, d; N.J.S.A. 2C:43-7.1. The connection between the effectiveness of the deterrent influence of criminal sanctions, the likelihood of accurate detection of recidivist acts and a prior offender's perception of the likelihood of detection is too apparent to require explanation. While the state's interest in detection of an offender's new crimes diminishes somewhat when the offender completes his or her sentence and the state no longer has an obligation or right to supervise, it is not obliterated; the state's continuing interest in detecting past and prior crimes is evidenced by laws that provide enhanced sentences for repeat offenders regardless of the order of convictions. See, e.g., State v. Hawks, 114 N.J. 359, 367, 554 A.2d 1330 (1989). The state's interest in deterrence does not diminish and remains a compelling objective. Sczubelek, supra, 402 F.3d at 185.
DNA profiles provide a uniquely reliable, efficient and unalterable means of identifying and detecting perpetrators of crime that is central to deterrence. Ibid.; Green, supra, 354 F.3d at 676. The numerical values that constitute a DNA profile are readily compared with the numerical values of forensic profiles without subjective judgments. While it is possible for an offender to alter his or her appearance or even fingerprints, a person cannot alter his or her DNA. O'Hagen, supra, 380 N.J.Super. at 146, 881 A.2d 733; see Sczubelek, supra, 402 F.3d at 185 (discussing alteration of identity); Jones, supra, 962 F.2d at 307.
There are additional benefits to the criminal justice system. Accuracy in investigation and prosecution serves the ends of justice, and the "DNA Act can reasonably be said to advance" that compelling interest. Sczubelek, supra, 402 F.3d at 185. One need only consider the potential to eliminate suspects selected because of a faulty identification or a police officer's suspicion based on similarities between a past crime and one under investigation to recognize the benefit to an offender who becomes the focus of an investigation on such bases. See, e.g., State v. Green, 86 N.J. 281, 293-94, 430 *49 A.2d 914 (1981). While the database is not necessary to avoid erroneous convictions (an offender can always produce his or her DNA to defeat a mistaken identification in a case involving forensic DNA, N.J.S.A. 2A:84A-32a; State v. Hogue, 175 N.J. 578, 584-85, 818 A.2d 325 (2003)), the database will provide an important means of eliminating suspects before they become targets of an investigation. Sczubelek, supra, 402 F.3d at 185. That is an outcome that will redound to a prior offender's benefit and permit officers to refocus their efforts.
Plaintiffs point to anecdotal evidence of cross-contamination of forensic evidence and confusion of DNA samples and argue that DNA profiling is fallible and presents a new potential for misidentification, thereby undermining defendants' claims about the efficacy of the Act. Because each offender's DNA is static, human error affecting offender profiles is readily detectable. Moreover, there is no evidence that errors related to forensic evidence are any more likely than errors related to partial fingerprints or eyewitness identifications; the evidence suggests otherwise. Sczubelek, supra, 402 F.3d at 184-85 (noting that DNA profiling is more reliable than fingerprinting). The legal system is equipped to address testing errors. See United States v. Morrow, 374 F.Supp.2d 51, 68 (D.D.C.2005) (discussing arguments about DNA evidence based on laboratory deficiency and human error).
Plaintiffs also claim that the utility of this Act is undermined by the breadth of the crimes that subject an offender to testing. They view many of the predicate acts as unlikely to involve the transfer of bodily fluids or a trail of the perpetrator's blood, but defendants' experts explained that DNA profiles can be recovered from items not limited to the scenes of violent crimes or sexual offensese.g., cigarette butts, chewing gum, drinking cups, clothing and other objects that come in contact with sweat, saliva or skin. On that basis, it is apparent that the manner in which a perpetrator may leave DNA evidence behind is neither predictable nor wholly dependent on the nature of the crime. See, e.g., Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (burglar who also committed rape left his fingerprint on a doorknob).
Moreover, plaintiffs' overbreadth argument rests on an assumption that recidivists repeat the same crime, an assumption which is contradicted by the data on the experience of the State of Virginia in "matching" profiles and forensic evidence. The data show that 38% of violent crimes solved with DNA matches were perpetrated by offenders who had previous convictions for property crimes. O'Hagen, supra, 380 N.J.Super. at 150 n. 3, 881 A.2d 733; see Statement of the Senate Budget and Appropriations Committee, supra (noting the increase in DNA matches in states that include profiles of offenders convicted of property crimes).[20]
Given the evidence about DNA and recidivism, it would be difficult to select, by crime, offenders from whom collection of DNA would be so inherently unproductive as to undermine the substantiality of the state's interest in including their profiles in the database. See J.G., supra, 151 N.J. at 581-87, 701 A.2d 1260 (concluding that a diversity of views about the efficacy of HIV testing *50 was insufficient to void a statute authorizing the tests). Irrefutable proof of efficacy in every case is not required; evidence of some measurable effect in attaining the objectives of detecting and deterring recidivist acts is adequate and sufficiently apparent here. See Joye, supra, 176 N.J. at 603, 826 A.2d 624; Jones, supra, 962 F.2d at 308 (recognizing "greater utility for use of DNA data ... when the future crime is one of violence," but upholding statute including non-violent crimes). "It is not for us to weigh the advantages of one method of identification over another which is selected by the" Legislature, at least where conduct classified as a crime is at issue and the testing is limited to persons who have demonstrated their willingness to commit acts that are defined as crimes. Jones, supra, 962 F.2d at 308.
The Legislature is not indifferent to the effectiveness of the database. The Act requires the Attorney General to prepare a report that "evaluate[s] the effectiveness, including cost effectiveness, of having the samples available to further police investigations and other forensic purposes." N.J.S.A. 39:5-41g (L. 2003, c. 183, § 6). That report, which is due in March 2008, must include "the number of identifications and exonerations achieved through the use of the samples" since 1994. Ibid. The fact that the Act requires such a report is indicative of the lawmakers' commitment to a system that is narrowly tailored to further the legitimate interests.
The Legislature's assumptions about the need and potential to deter recidivist acts are reasonable and rational when based on prior acts of adult and juvenile offenders over the age of fourteen, but we are not at all certain that the same assumptions are rational when based on the conduct of younger children. The Legislature has made a "clear [ ] determination that children under fourteen, no matter how serious the offenses with which they are charged, simply are too immature as a matter of law to be tried as an adult." In re Registrant J.G., 169 N.J. at 304 325, 777 A.2d 891 (2001). That determination is based on views about a "child's capacity to take responsibility for criminal acts" and the inefficacy of deterrent measures directed against children who have limited understanding. Id. at 327, 777 A.2d 891. That conclusive determination is at odds with any assumptions about the likely recidivism of young children or the likely impact of a deterrent measure based on their understanding of the enhanced prospects for detection.
While the Supreme Court has held that juveniles under the age of fourteen may be required to register under Megan's Law, the purpose of that law is to protect the public by disseminating information. The efficacy of the measures included in Megan's Law is dependent upon assumptions about the recipients', not the children's, capacity to understand. In re Registrant J.G., supra, 169 N.J. at 338-39, 777 A.2d 891 (rejecting claim that Megan's Law unconstitutionally restricts liberty); see Doe, supra, 142 N.J. at 86-87, 90, 662 A.2d 367; see also J.G., supra, 151 N.J. at 577-93, 701 A.2d 1260 (approving HIV testing of juveniles that provides information to victims).
We conclude that this Act establishes a database and databank that further the state's compelling interest in deterring and detecting recidivist acts of prior offenders, at least when applied to adult and juvenile offenders over the age of fourteen.

2. The offenders' reasonable expectations of privacy and the obtrusiveness of each intrusion.
This Act entails several intrusions over a significant period of time. We consider the obtrusiveness of each in light of *51 the offenders' reasonable expectation of privacy at the relevant time and the statutory provisions that minimize the intrusions.
The initial intrusion is the restriction on freedom of movement required to permit application of the buccal swab or needle prick to collect the offenders' biological sample. This Act permits that detention only while the offender is serving the sentence imposed as a consequence of adjudication of delinquency or conviction. N.J.S.A. 53:1-20.20. The additional momentary detention required for collection is not significant when viewed in that context. See Doe, supra, 142 N.J. at 28 n. 8, 662 A.2d 367 (summarily rejecting the claim that the registration required by Megan's Law, even after sentence, unreasonably intrudes upon the offenders who must appear to register and provide fingerprints); In re Registrant J.G., supra, 169 N.J. at 339, 777 A.2d 891 (summarily rejecting claim that the registration and notification requirements violate a fundamental right to freedom of movement). This intrusion is kept to a minimum because the Act prohibits the harassment of repetitive requests for biological samples. N.J.S.A. 53:1-20.22.[21]
The second intrusion is the collection of the biological sample. "[T]he intrusion occasioned by a blood test, or a buccal swab, is minimal because `such `tests are... a commonplace ... and ... the procedure involves virtually no risk, trauma, or pain.''" L.R., supra, 382 N.J.Super. at 619, 890 A.2d 343 (quoting O'Hagen, supra, 380 N.J.Super. at 148, 881 A.2d 733 (quoting Skinner, supra, 489 U.S. at 625, 109 S.Ct. at 1417, 103 L.Ed.2d at 665)). It does not implicate modesty. See Joye, supra, 176 N.J. at 598-99, 826 A.2d 624 (distinguishing the intrusiveness of urine collection and buccal swabs). The collection process is not unlike other conditions of sentence to which these offenders are subject at the time. See Green, supra, 354 F.3d at 680 (Easterbrook, J. concurring) (noting that offenders sentenced to prison or a term of supervised release are commonly required to submit to similar tests to detect illegal drugs).
The third intrusion is the testing that extracts the offenders' DNA profile from the biological sample, which is a search. Under the protocols in place, that search may be repeated after an offender has completed his or her sentence. Defendants acknowledge that biological samples are retested, for purposes of quality control, prior to disclosing the identity of the offender to a law enforcement agency that believes it has forensic evidence that matches an offender profile. Defendants also admit that in 1998, they retested all samples in the databank in order to utilize new technology and develop profiles that can be compared with those included in the National database. Because these searches may be performed after service of sentence, we evaluate the obtrusiveness of this retesting from the perspective of offenders' reasonable expectation of privacy post-sentence, when the offenders' interest is at its height.
The obtrusiveness of the testing depends on the data that may be extracted pursuant to N.J.S.A. 53:1-20.21. See Skinner, supra, 489 U.S. at 626-27, 109 S.Ct. at 1418, 103 L.Ed.2d at 665-66 (noting that data extracted from urine was limited to *52 the presence of substances indicative of illegal drug use not personal information about medical condition); Joye, supra, 176 N.J. at 599, 826 A.2d 624 (noting that positive drug tests attributable to medical conditions were reported as negative to avoid disclosure of personal information not relevant to the testing program).
This Act permits only testing that is necessary "to analyze and type the [offender's] genetic markers," N.J.S.A. 53:1-20.21, in accordance with a system "compatible with [the identification system] utilized by the FBI." N.J.S.A. 53:1-20.23. The evidence in this case demonstrates that the present testing protocol extracts numerical values that are, in themselves, indicative of nothing other than identity, a DNA fingerprint. Thus, while testing extracts information about identity that no one exposes to public view, it does not permit law enforcement to obtain private information about medical conditions, thoughts, feelings and propensities that are "deserving of a high degree of protection." Doe, supra, 142 N.J. at 88, 662 A.2d 367.
Because the Act does not authorize access to profiles or samples for purposes of extracting information beyond the "genetic markers" necessary for identification, we are not impressed by plaintiffs' claim that advances in technology and understanding of human DNA may make future tests or review of profiles more intrusive. See Kincade, supra, 379 F.3d at 849-51 (Reinhardt, J., dissenting) (upon which plaintiffs rely). Whether or not it becomes possible to derive information about medical conditions, heredity, race or criminal propensities from testing the thirteen loci that are examined with the STR technology, this Act does not permit testing or cataloguing for such purposes. Moreover, the division's obligation to adopt regulations, which we discuss in Section IV, ensures compliance with that restriction. See Kincade, supra, 379 F.3d at 837-38. A court order is required to permit access for "research." Compare N.J.S.A. 53:1-20.21 (authorizing a variety of uses), with N.J.S.A. 53:1-20.24 (permitting only law enforcement use without court order).
Any post-sentence retesting of the sample that is limited to identifying information does not involve an additional invasion of privacy. When limited to acquisition of identifiers, a retest is comparable to a review of photographs or fingerprints on file with the assistance of technology that permits magnification to ascertain more detailed information. A review of the database of profiles is no different than a review of photographs or fingerprints on file with the assistance of technology that permits rapid, automated comparisons with a large number of photographs or fingerprints.
Because this Act prohibits any access to profiles for purposes unrelated to criminal investigations without a court order, it does not implicate privacy interests in reputation, avoidance of stigma or public disclosure of confidential information.[22]Cf. Doe, supra, 142 N.J. at 99-109, 662 A.2d 367. Thus, the issue is an offender's post-sentence expectation in preventing testing of a sample on file and a comparison of the DNA profile with forensic evidence in connection *53 with a law enforcement agency's official investigation of a crime.
"A person convicted of a crime [or adjudicated delinquent] has a substantially diminished expectation of privacy in his or her identity." L.R., supra, 382 N.J.Super. at 619, 890 A.2d 343; see O'Hagen, supra, 380 N.J.Super. at 148, 881 A.2d 733; Sczubelek, supra, 402 F.3d at 177; Kincade, supra, 379 F.3d at 837; Groceman, supra, 354 F.3d at 413-14; Green, supra, 354 F.3d at 680 (noting that collection of identifying information is rationally related to the criminal conviction). We disagree with the trial judge's conclusion that completion of sentence revives a privacy interest relevant to use of identifying information in a subsequent criminal investigation. See Green, supra, 354 F.3d at 680 (Easterbrook, J., concurring) (noting a broad range of post-sentence measures that "fall within the expected conditions ... of those who have suffered a lawful conviction" (quoting McKune v. Lile, 536 U.S. 24, 36, 122 S.Ct. 2017, 2026, 153 L.Ed.2d 47, 59 (2002))).
Laws have long required law enforcement officers to retain fingerprints of persons convicted of crime. N.J.S.A. 53:1-15. Since 1994, the Legislature has required fingerprinting of all juveniles adjudicated delinquent on the basis of an act that would constitute a crime if committed by an adult. N.J.S.A. 2A:4A-61c, d; L. 1994, c. 56, § 2; see In re S.S., 273 N.J.Super. 31, 640 A.2d 1189 (App.Div.1994) (discussing the expansion of the practice of fingerprinting juveniles between 1948 and the policies of the Juvenile Code). Despite the rehabilitative goals of the juvenile justice system that militate against disclosure of information linking juveniles and their adjudications, their fingerprints are forwarded to the division for the "sole purpose of exchange between" law enforcement agencies in and outside of this State. N.J.S.A. 2A:4A-61d; see N.J.S.A. 2A:4A-60; N.J.S.A. 2A:4A-60.1; N.J.S.A. 2A:4A-61.[23]
Even after an adult or juvenile offender qualifies for expungement or sealing of a juvenile record, fingerprints and other records remain accessible in the event of recidivism. See N.J.S.A. 2C:52-20, -21, -22, -23, -27, -29; N.J.S.A. 2A:4A-62d; State v. XYZ Corp., 119 N.J. 416, 421, 575 A.2d 423 (1990). In sum, offenders do not have an expectation of privacy that is restored after completion of sentence and relevant to post-sentence testing of pre-acquired samples or use of profiles for purposes of an official investigation of a crime.

3. The special needs furthered outweigh the minimal intrusions entailed.
Our weighing of the relevant interests convinces us that this Act furthers special needs beyond ordinary crime detection which substantially outweigh the obtrusiveness of the various intrusions on the offenders' reasonable expectations of privacy. The seizures and searches authorized are neither arbitrary nor left to the discretion of law enforcement officers who *54 seek to detect criminal conduct. They are mandated by a comprehensive statutory scheme that is limited to persons on the basis of their acts that must be established by the highest degree of proof recognized in our legal system. The physical detention and intrusion involved in the collection of a biological sample are brief, minimally intrusive and permitted on only one occasion. Following conviction or adjudication of delinquency on the basis of conduct constituting a crime, an offender has no reasonable expectation of keeping identifying information from law enforcement officers investigating a crime, and the Act does not require or permit extraction of private information or allow stigmatizing public disclosures. The Act includes safeguards against unauthorized testing, in the form of regulations, and disclosure, in the form of regulations and punishment of those who make unauthorized disclosures.
With respect to adults and juveniles over the age of fourteen at the time of their qualifying conduct, the Act is tailored to further a compelling special need beyond ordinary crime detection. These offenders have demonstrated their willingness to engage in conduct that is defined as a crime, which gives the state an interest in this means of deterring and detecting their recidivist acts.
For all these reasons, we hold that when applied to adults and juveniles over the age of fourteen, the seizure and searches mandated by this Act are constitutionally reasonable because the Act itself "satisfies the ... reasonableness requirement [of the State and Federal Constitutions] under well-established principles." Griffin, supra, 483 U.S. at 873, 107 S.Ct. at 3168, 97 L.Ed.2d at 717.

IV.
We must address the division's failure to adopt regulations required by the Act. The Act requires the division to "adopt rules governing the procedures to be used in the submission, identification, analysis and storage of DNA samples and typing results of DNA samples submitted...." N.J.S.A. 53:1-20.23. The division also must "adopt rules governing the methods of obtaining information from the State database and CODIS and procedures for verification of the identity and authority of the requestor." N.J.S.A. 53:1-20.24b. Neither the record below nor our research has disclosed any rules other than those adopted by the Department of Corrections concerning collection of samples from offenders. See N.J.A.C. 10A:1-2.2; N.J.A.C. 10A:14-3A.1; N.J.A.C. 10A:14-3A.2.
The evidence defendants presented about the analysis performed in testing demonstrates that the present testing procedures comply with the Act. Plaintiffs do not claim otherwise. Nonetheless, the Act requires the division to adopt rules, and it must do so in accordance with the Administrative Procedures Act (APA). N.J.S.A. 52:14B-1 to -15.
"The APA defines an administrative rule as an `agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency.' N.J.S.A. 52:14B-2(e)." Doe, supra, 142 N.J. at 95, 662 A.2d 367. Without doubt, the testing protocol and rules governing access to the profiles cannot be characterized as "statements concerning internal management" of the agency that are exempt from the APA's rulemaking requirements. Id. at 95-96, 662 A.2d 367. The protocol and rules have general applicability and a substantial impact on the rights of the individuals tested. N.J.S.A. 52:14B-2(e); Doe, supra, 142 N.J. at 96, 662 A.2d 367; cf. State v. Garthe, 145 N.J. 1, 7, 678 *55 A.2d 153 (1996) (formal rulemaking not required to set procedures for testing breathalyzer machines).
New forms of testing or expansion of the analysis of individual profiles (or the collective profiles) to identify markers for medical or emotional conditions, characteristics or propensities would be in conflict with the Act and present significant questions about the privacy of offenders that are not implicated by present practices. See Doe, supra, 142 N.J. at 96, 662 A.2d 367. While the Legislature's intention to preclude that sort of analysis and limit data that may be extracted from biological samples to identifying information is "clearly and obviously inferable from the law," the development of testing protocols that meet that standard requires some "interpretation of [the Act]." Id. at 96-97, 662 A.2d 367 (discussing the factors relevant to the question whether rule making in accordance with the APA is required).
A formal rulemaking process is essential to permit both input by interested parties and judicial and legislative review of decisions made by law enforcement officers and those who operate laboratories, in light of advancing technology. See id. at 97, 662 A.2d 367. That process is a critical component of the Act and what permits us to find that the Act is reasonable in light of the offenders' privacy interests.
This clarification and enforcement of the division's obligation to promulgate the rules that are required by the Act addresses plaintiffs' legitimate concern that testing may become far more obtrusive in the future. We hold that the division may not employ a technology different than the one described in the certifications presented below or conduct analysis of the individual or collective profiles for purposes other than ascertaining the identity of each offender until it has promulgated rules in accordance with the APA that define and delimit the testing and analysis. We further hold that the division must promulgate the other rules required by this Act as soon as is practicable. See Martin, supra, 90 N.J. at 324-25, 447 A.2d 1290 (requiring the agency to adopt regulations to safeguard private information gathered in connection with regulation of the casino industry as a condition of collection).

V.
Finally, we consider plaintiffs' claim that the expungement remedy engrafted by the trial judge is required to prevent unreasonable searches or as a matter of substantive or procedural due process or New Jersey's doctrine of fundamental fairness. As we understand it, plaintiffs' argument is that any post-sentence retesting of biological samples or review of DNA profiles impinges upon privacy rights that are restored on completion of sentence without justification supported by legislative or judicial findings about the individuals' likely recidivism or the potential relevance of their DNA profiles. We reject the claim.
Preliminarily, the Supreme Court has admonished against interchanging "the right of privacy inherent in Article I, paragraph 1 ... with the privacy interests that otherwise would be reviewed under [the] Court's search-and-seizure jurisprudence" and expressed the Court's preference for separation of "the two lines of analysis, reserving exclusively to Article I, paragraph 7 any question implicating one's privacy interest in connection with a governmental search...." Joye, supra, 176 N.J. at 610-11, 826 A.2d 624. Adhering to that approach, we discussed post-sentence retesting of samples and use of profiles in our analysis of the reasonableness of these searches and seizures authorized by this *56 Act in Section III. In this Section we briefly address plaintiffs' additional arguments based on due process and fundamental fairness.
The Fourteenth Amendment and Article I, ¶ 1 of the New Jersey Constitution protect interests in "personal liberty" that include a right of "confidentiality," which is avoidance of disclosure of personal matters, a right of "autonomy," which protects against interference with certain personal decisions and arbitrary or harassing governmental action, and a right to "reputation," which includes protection against unwarranted stigma. Doe, supra, 142 N.J. at 77-78, 89, 100-06, 662 A.2d 367. Any invasion of a "fundamental right of privacy must be minimized by utilizing the narrowest means which can be designed to achieve the public purpose." Id. at 90, 662 A.2d 367 (quoting Martin, supra, 90 N.J. at 318, 447 A.2d 1290).
We cannot discern any intrusion upon protected liberty interests flowing from the post-sentence retention and use of biological samples and DNA profiles authorized by this Act. Completion of a sentence does not alter the interests in a manner that is constitutionally significant.
The Act has the potential to deter a post-sentence crime. But, the decision to commit a crime is not comparable to the personal decisions about medical care, private intimacy or association that have been protected under judicial decisions addressing autonomy. See Joye, supra, 176 N.J. at 637-38, 826 A.2d 624 (LaVecchia, J., dissenting) (discussing cases involving personal decisions); Martin, supra, 90 N.J. at 325-31, 447 A.2d 1290 (considering chilling effect of required disclosures on constitutionally protected rights of association).
The Act does not authorize any post-sentence intrusion on freedom from arbitrary government action. Should an investigation of another crime come to focus on an offender because of a DNA "match," any detention, search or arrest based on that "match" must be conducted in accordance with the constitutional prohibition against unreasonable search and seizure, not arbitrarily. Moreover, the offender must be afforded all process that is due at every stage of any subsequent criminal proceeding. See Doe, supra, 142 N.J. at 84, 100-09, 662 A.2d 367 (discussing the right to be left alone and freedom from arbitrary government action and unwanted harassment); cf. id. at 77-91, 662 A.2d 367 (rejecting claim that post-sentence registration obligations under Megan's Law violate rights protected by Article I, paragraph 1 of the New Jersey Constitution and the Fourteenth Amendment).
The Act does not implicate an offender's post-sentence interest in regaining his or her good name or resuming a productive life. The Act simply does not permit any public disclosure of information linking the offender and his or her prior crime that could stigmatize or damage the offender's post-sentence interests in reputation. See id. at 99-109, 662 A.2d 367 (discussing the dissemination of stigmatizing information and its impact on reputation).
Similarly, this Act does not unconstitutionally impinge on the offenders' interest in keeping personal information private. Where compelled disclosure of information is at issue, courts balance the individual's reasonable expectation of privacy in the information sought, the government's interest in obtaining it and protections against unnecessary dissemination. Doe, supra, 142 N.J. at 78, 78 n. 20, 90, 662 A.2d 367; Martin, supra, 90 N.J. at 318, 447 A.2d 1290. In Section III we discussed the balance of the relevant public and individual interests. In Section IV we discussed the significant protections against abuse of this authority afforded *57 through the regulatory process. We rely on and incorporate those discussions here and reiterate only the conclusions most pertinent.
Post-sentence, an offender convicted or adjudicated delinquent on the basis of conduct that is defined as a crime does not acquire a reasonable expectation of retrieving identifying information from law enforcement to avoid its use in connection with a subsequent criminal investigation or sentencing proceeding. See Green, supra, 354 F.3d at 680 (Easterbrook, J., concurring) (noting the broad range of restrictions that may be imposed on persons who have been found guilty of criminal conduct in discussing application of the DNA statute beyond service of sentence). The government's interests in retaining the biological sample and profile for that purpose substantially outweigh the individual's privacy interest, at least where the offender was over the age of fourteen at the time he or she engaged in conduct defined as a crime.
We stress that this Act is narrowly tailored to prohibit extraction or public disclosure of any confidential information about medical condition, thoughts, feelings and propensities that are "deserving of a particularly high degree of protection." Doe, supra, 142 N.J. at 88, 662 A.2d 367. The Act strictly limits the division's discretion to gather and disseminate information and ensures compliance by requiring regulations that are subject to public comment and legislative and judicial review. Id. at 90-91, 662 A.2d 367; Martin, supra, 90 N.J. at 320, 447 A.2d 1290.
In the final analysis, we see no basis for concluding that an offender's interest in autonomy, confidentiality, reputation or freedom from unreasonable search permit or require a judicially engrafted expungement remedy that applies upon completion of sentence as a matter of constitutional right. The balance between the relevant intereststhe government's interest in maintaining the identifying information for use in solving and deterring crimes and an offender's countervailing interest in avoiding detection on the basis of the identifying information-is not appreciably altered upon expiration of an offender's sentence.[24]
Plaintiffs' complaint about the inadequacy of legislative findings is in essence a claim that the Act is overbroad. Given the evidence about recidivism and the variety of sources of forensic DNA evidence discussed in Sections II and III, we cannot conclude that the Act is tailored too broadly because it is not limited to a particular class of crimes that plaintiffs deem more likely to involve DNA evidence. Martin, supra, 90 N.J. at 318, 447 A.2d 1290. As we held in Section III, when applied to persons over the age of fourteen who have been adjudicated delinquent or convicted on the basis of conduct sufficiently serious to constitute a crime, the Act furthers compelling governmental interests. Its scope is rational in relationship to the objectives served. See Kenny v. Byrne, 144 N.J.Super. 243, 255, 365 A.2d 211 (App.Div.1976) (noting that "[i]f the full objective of [a] regulation cannot be achieved by other more limited means, the charge of overbreadth loses its validity"), aff'd o.b., 75 N.J. 458, 383 A.2d 428 (1978). "It is untenable legal doctrine, constitutional or otherwise, that the State must choose a means which is less effectual in order to achieve [fair and reasonable] aims." Ibid. (relying on Storer v. Brown, *58 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714, 727 (1974)).
Plaintiffs' claim that an expungement remedy is required as a matter of procedural due process and fundamental fairness is also unavailing. An offender's obligation to submit to the intrusions authorized by this Act is based upon the highest standard of proof recognized under our law. See Kincade, supra, 379 F.3d at 839 n. 39 (noting that testing required by statute and based upon conviction precludes arbitrary, capricious, harassing and illegitimate searches). This Act (unlike the community notification provisions of Megan's Law that permit public disclosure of information about an offender based on a present risk of recidivism that is not established by the conviction or adjudication) requires no findings beyond the qualifying conviction or adjudication and involves no public disclosures that could stigmatize or damage reputation. See Doe, supra, 142 N.J. at 99-109, 662 A.2d 367 (requiring procedural protections, as a matter of due process and of fundamental fairness under the State Constitution, in order to avoid erroneous or arbitrary governmental determinations about present risk prior to public disclosure of a stigmatizing risk assessment and the offender's home address).
Procedural protections to prevent arbitrary determinations about expungement would be required if such a remedy were available under the statute. But, we see no constitutional basis for imposition of an expungement remedy. The question whether the general expungement statute applies to DNA profiles and biological samples is not before us, and the Legislature may clarify its intention on that point before the issue arises.
Affirmed in part and reversed in part. The provisions of the order that address expungement and limit exchange of DNA profiles with other law enforcement agencies are vacated. The division is directed to promulgate the regulations required by the Act in accordance with Section IV of this decision.
STERN, P.J.A.D. (concurring).
We have previously held that "[t]he search compelled by the DNA Act ... is reasonable under both a special needs analysis and the totality of circumstances test." State v. O'Hagen, 380 N.J.Super. 133, 149, 881 A.2d 733 (App.Div.), certif. granted, 185 N.J. 391, 886 A.2d 661 (2005). I joined that opinion and adhere to that view for the reasons stated in O'Hagen and in Judge Grall's comprehensive opinion which I join today. I write separately, however, to address an issue of concern to me  the use of the DNA databank sample against the defendant to solve crimes which have occurred before his conviction and the taking of his DNA sample under the Act.
The Legislature has given reasons for adoption of the Act. See N.J.S.A. 53:1-20.18, -20.21. The reasons include both deterrence and the prevention of recidivism. Clearly, a person's knowledge that law enforcement is in possession of DNA samples and sophisticated equipment to match samples should go a long way towards deterring a convicted offender from committing another crime. I agree with my colleagues that there is no constitutional reason to prevent the use of the databank in an endeavor to match the samples with new crime scene evidence, and the convicted defendant knows that can be done. It has been done for decades with fingerprints and photographs, and merely because technology has advanced, and the DNA sample is a bit more intrusive, does not mean the rationale warranting such investigative techniques must be reconsidered.
*59 But deterrence, and particularly deterrence of recidivist conduct, does not justify or even explain why law enforcement officers, upon the taking of a DNA sample following conviction, can constitutionally use that sample to solve a past crime committed by the defendant who was compelled to provide the sample.[1] And if one of the critical purposes of sentencing is to deter, see e.g., N.J.S.A. 2C:1-2(a)(2), -2(b)(3), how can deterrence be used as a justification to collect DNA for use incident to the investigation of a past crime, at least against the defendant who gave the sample upon conviction. On the other hand, as we have said in O'Hagen and again today, the collection of DNA from a convicted offender, and use of the databank, can be significant in identifying the criminal and exculpating an accused. O'Hagen, supra, 380 N.J.Super. at 145-47, 881 A.2d 733. However, someone charged with an offense, or even under suspicion, can always volunteer his DNA for comparison against a sample taken from the scene. Hence, the rationale advanced in our opinions for upholding the compelled collection of DNA samples from convicted offenders has little application with respect to use against the donor with respect to a crime he previously committed.[2]
I concur in the judgment because I am not convinced that the cases involving the use of fingerprints and photographs to solve past crimes committed by the person compelled to give the sample are inapplicable in the more advanced setting involving DNA samples. See Landry v. Atty. Gen., 429 Mass. 336, 709 N.E.2d 1085, 1092 (1999), cert. denied, 528 U.S. 1073, 120 S.Ct. 785, 145 L.Ed.2d 663 (2000); Boling v. Romer, supra, 101 F.3d at 1340 (search and seizure not unreasonable because of the convicted felon's diminished expectation of privacy, coupled with "the minimal intrusion of saliva and blood tests[,] and the legitimate government interest in the investigation and prosecution of unsolved and future criminal acts by the use of DNA in a manner not significantly different from the use of fingerprints"); see also Smith v. State, 744 N.E.2d 437 (Sup.Ct. Ind.2001) (use of DNA sample taken after second arrest could be used to create a match with DNA sample from scene of prior crime). On the other hand, even if the matter poses no concern under the federal constitution, it may present an issue for consideration under the state constitution which provides greater protection in various settings. See, e.g., Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J. 568, 595, 608, 826 A.2d 624 (2003); id. at 635-36, 826 A.2d 624 (LaVecchia, J. dissenting) (use of state constitution with respect to validity of random suspicionless drug testing of high school students; program upheld where no law enforcement purpose or exposure to criminal liability). In any event, I do not believe we need resolve in this case any issue concerning the use of the DNA databank against a defendant with respect to a crime he or she committed before being compelled to give the sample. I reserve definitive judgment on that issue and would address it when and if a motion to suppress is filed in a case in which the question must be addressed.
Judge PARKER joins this opinion.
NOTES
[1] As adopted in 1994, the Act applied to persons convicted of designated sex offenses. See State v. O'Hagen, 380 N.J.Super. 133, 139-40, 881 A.2d 733 (App.Div.) (discussing the history of amendments that each expanded the class of offenders required to submit a sample for DNA testing), certif. granted, 185 N.J. 391, 886 A.2d 661 (2005). We limit our discussion to the Act in its present form.
[2] Mercer County Probation Services, which is in the Judicial Branch of State Government, did not participate in the proceedings in the Law Division and does not participate on appeal.
[3] With consent of the parties under circumstances that do not foreclose the State from obtaining either A.A.'s or Allah's profile, the order was stayed pending appeal.
[4] Plaintiffs do not argue and are deemed to have abandoned the claim that the Act as applied to them is an ex post facto law. See Muto v. Kemper Reinsurance Co., 189 N.J.Super. 417, 420-21, 460 A.2d 199 (App.Div. 1983). We rejected an ex post facto challenge to this Act in In re L.R., 382 N.J.Super. 605, 890 A.2d 343 (App.Div.2006).
[5] The parties present no argument specific to individuals acquitted of charges based on a finding of not guilty by reason of insanity, and this decision does not address that group.
[6] When it is necessary to take a blood sample because of the offender's unwillingness to submit to a swab, the practice is to acquire a court order and blood is taken by pricking the offender's finger with a needle.
[7] The Act employs a variety of terms to refer to DNA profiles: "typing results"; "record[s] of identification characteristic profiles of DNA samples"; and "record[s] of identification characteristics." N.J.S.A. 53:1-20.21; N.J.S.A. 53:1-20.23; N.J.S.A. 53:1-20.24a.
[8] The division first used this technology in 1998 when the FBI adopted it. "Because the [prior testing method and STR] examine different aspects of DNA [the resulting profiles could not] be compared...." For that reason, the division re-analyzed the samples in its databank in 1998. The FBI recommends retention of biological samples to facilitate similar re-analysis (without the need to recall prior offenders to acquire second samples) and for quality control purposes.
[9] N.J.S.A. 53:1-20.37 requires the Attorney General "to adopt rules governing the procedures to be used in the analysis and storage of DNA profile information obtained in accordance with [N.J.S.A. 2A:84A-32a]," which provides for DNA testing on motion of an incarcerated convicted offender.
[10] The process for exchange of information between law enforcement agencies was explained in Dr. Callaghan's certification and accompanying documents. In the event of a suspected match, an agency that suspects a match must contact the agency that submitted a profile of an individual to learn the identity of the person. The FBI "recommends" procedures for verification of the accuracy of the information before disclosure of identifying information to the requesting agency. Where DNA testing of a suspect is warranted by a confirmed match, the FBI recommends authorization by court order. New Jersey's Act does not authorize such testing without a court order.
[11] Subsection c of N.J.S.A. 53:1-20.24 provides for a "separate population database comprised of records [that do not include any] personal identification" and limits access to it.
[12] One who obtains a reversal of a verdict of not guilty by reason of insanity is also entitled to expungement upon dismissal of the charges. Ibid.
[13] As the judge below aptly noted, the unanimity of the holdings does not reflect the significant disagreement expressed in dissenting opinions. See, e.g., Sczubelek, supra, 402 F.3d at 189 (McKee, J., dissenting); Kincade, supra, 379 F.3d at 842 (Reinhardt, J., dissenting); and Raines, supra, 857 A.2d at 52 (Bell, J., dissenting).
[14] As O'Hagen explains, several courts that have considered similar statutes, including the Third Circuit, Sczubelek, supra, 402 F.3d at 184, have rejected the "special needs" exception and upheld the laws by balancing the interests of the offender and the government under the totality of the circumstances. O'Hagen, supra, 380 N.J.Super. at 143-45, 881 A.2d 733. Other courts have applied the "reasonableness" test without considering whether the statutes would also pass muster under the "special needs" exception. See, e.g., Padgett, supra, 401 F.3d at 1278 n. 4; Jones v. Murray, 962 F.2d 302, 307 n. 2 (4th Cir.1992); Kincade, supra, 379 F.3d at 832.
[15] The United States Supreme Court has applied this "special needs" exception in upholding suspicionless drug testing of railroad employees, officers of the United States Customs Service applying for certain positions and participants in high school athletics and extracurricular activities, Bd. of Educ. v. Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002); Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); Skinner, supra, 489 U.S. at 634, 109 S.Ct. at 1422, 103 L.Ed.2d at 670-71; Von Raab, supra, 489 U.S. at 665, 109 S.Ct. at 1390-91, 103 L.Ed.2d at 702-03; and, in upholding a probation officer's search of a probationer's home conducted pursuant to a reasonable regulation important to supervision and reasonable in light of the probationer's sentence and diminished expectation of privacy, Griffin, supra, 483 U.S. at 873-74, 107 S.Ct. at 3168, 97 L.Ed.2d at 717.

New Jersey courts have applied the "special needs" exception in upholding drug testing of students involved in specific activities, Joye, supra, 176 N.J. at 573, 597, 607, 826 A.2d 624; law enforcement officers, N.J. Transit PBA Local 304 v. N.J. Transit Corp., 151 N.J. 531, 543, 701 A.2d 1243 (1997); HIV testing of certain offenders, State In re J.G., 151 N.J. 565, 577-93, 701 A.2d 1260 (1997); suspicionless searches of visitors to prisons, Jackson v. Dep't of Corr., 335 N.J.Super. 227, 232-35, 762 A.2d 255 (App.Div.2000), certif. denied, 167 N.J. 630, 772 A.2d 932 (2001); and suspicionless drug tests of prisoners, Hamilton v. Dep't of Corr., 366 N.J.Super. 284, 287, 841 A.2d 94 (App.Div.2004).
[16] The Supreme Court found that the "critical difference between [its prior "drug-testing" cases, Skinner, Von Raab, Acton and Earls] and [Ferguson was] the nature of the `special need' that was advanced as a justification...." Id. at 79, 121 S.Ct. at 1289, 149 L.Ed.2d at 217.
[17] As discussed in Section II, although this Act authorizes use of DNA profiles for additional purposes not related to law enforcement, N.J.S.A. 53:1-20.21, any use not related to an official law enforcement investigation of a crime requires a court order. N.J.S.A. 53:1-20.24. Thus, we view these additional purposes as separable and neither look to them for a purpose "beyond" detection and deterrence of recidivism nor pass on the validity of using offender profiles for those distinct purposes. That is an issue that a court confronted with an application will address if the issue arises.
[18] In United States v. Knights, 534 U.S. 112, 119-20, 122 S.Ct. 587, 591-92, 151 L.Ed.2d 497, 505 (2001), the Court held that a police officer's search of a probationer's home was reasonable. The Court did not rely on "special needs" as it had in Griffin. See id. at 118-19, 122 S.Ct. at 591, 151 L.Ed.2d at 505. The Court did not distinguish the cases on the basis of law enforcement "purpose"; rather the Court indicated that the "special needs" exception of Griffin was inapplicable because the search was not conducted by a probation officer pursuant to a reasonable regulation. Id. at 119-20, 122 S.Ct. at 592, 151 L.Ed.2d at 505-06.
[19] This Act does not and could not authorize law enforcement to collect a biological sample from an individual or group in connection with the investigation of a specific crime without suspicion or court order. As with acquisition of fingerprints, a different constitutional analysis applies when identifying data of this sort is sought in connection with an investigation and not in accordance with a uniform requirement limited to persons who are convicted or adjudicated delinquent on the basis of conduct sufficiently serious to constitute a crime. See Hayes v. Florida, 470 U.S. 811, 814, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705, 709 (1985) (discussing line-ups and fingerprinting conducted to obtain identification evidence relevant to a specific crime); State v. Hall, 93 N.J. 552, 554, 461 A.2d 1155 (same), cert. denied, 464 U.S. 1008, 104 S.Ct. 526, 78 L.Ed.2d 709 (1983).
[20] Thirty-four states have statutes that require all persons convicted of felonies to submit DNA, forty-seven include all violent crimes, forty-six include burglary and thirty-eight include drug crimes. http://www.dnaresource.com (follow "Legislation & State Statutes" hyperlink; then select "State DNA Database Laws Qualifying Offenses").
[21] Although the certification submitted by the FBI's expert below implies that he believes the State defendants could require offenders to submit additional biological samples in order to permit retesting with new technology, this Act does not authorize either post-sentence detentions or acquisition of a second sample from an offender who has provided an adequate sample on a prior occasion. Ibid.; N.J.S.A. 53:1-20.20.
[22] In this respect, this Act is less intrusive than laws governing fingerprints, which permit access to the database of adult fingerprints for a variety of purposes that narrow post-sentence opportunities for employment, gun ownership and admission to professions. See, e.g., N.J.S.A. 53:1-20.6, -20.8, -20.9a, -20.9b; N.J.S.A. 2C:58-3c(1); cf. N.J.S.A. 2A:4A-48 (precluding imposition of civil disabilities associated with criminal conviction on the basis of juvenile adjudication). The database established by this Act cannot be accessed for any such purpose.
[23] The rehabilitative goals of the juvenile justice system have never been deemed to prohibit use of juvenile adjudications in connection with decisions about prosecution and sentencing. See N.J.S.A. 2A:4A-26a(2)(b) (factor in wavier); 2A:4A-43a(3) (factor relevant to disposition following adjudication); State v. Pindale, 249 N.J.Super. 266, 288-89, 592 A.2d 300 (App.Div.1991) (factor relevant to adult sentencing); see State in Interest of J.L.A., 136 N.J. 370, 378, 643 A.2d 538 (1994) (recognizing that in addition to rehabilitation the Juvenile "Code also reflects a correlative emphasis on ... deterrence). Thirty-one states, including New Jersey, subject juvenile offenders to DNA testing. http://www.dnar esource.com, supra. The National database has accepted DNA profiles of juvenile offenders where authorized by State law since 2004. 42 U.S.C.A. § 14132(a)(1)(C).
[24] The essence of our disagreement with the trial judge is our conclusion that termination of an offender's sentence does not restore the offender's expectation of privacy in identifying information or obliterate the state's interest in that information.
[1] As at this time I will assume that only the defendant has standing to object to the taking of his or her sample, I need not consider the use of the sample against someone other than the convicted offender who gave it upon conviction.
[2] The compelled taking poses no Fifth Amendment concern because it is "not testimonial in nature." Boling v. Romer, 101 F.3d 1336, 1339-40 (10th Cir.1996).